**5 BOROUGH PAWN, LLC, Ruben D. Cabrera, Rebecca Cabrera and Brian Cabrera, Plaintiffs,**

v.

**The CITY OF NEW YORK, New York City Police Department, Commissioner of Police Raymond Kelly and Sergeant Ron Marti, Defendants.**

No. 08 cv 3837 (CM).

United States District Court, S.D. New York.

June 22, 2009.

Paul Joseph Solda, Law Office of Paul Joseph Solda, New York, NY, for Plaintiffs.

Michael Keith Gertzer, Louise Althea Moed, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PLAINTIFFS' CROSS–MOTION FOR DISCOVERY

McMAHON, District Judge:

### Background

This lawsuit is rooted in a pawnshop owner's refusal to cede to the allegedly unconstitutional demands of a group of NYPD officers. Faced with the threat of arrest, plaintiff Brian Cabrera did not back down from his demand that defendant Sergeant Ron Marti ("Marti") and his fellow officers supply a warrant before searching the pawnshop's safe. The officers ignored Cabrera's demand and arrested him for violating Section 436. The charges against Cabrera were eventually dismissed.

The plaintiffs filed this lawsuit in response, alleging violations of their civil rights, as well as false imprisonment and various other state law claims.

One month after this lawsuit was filed, Marti—who had returned to the pawnshop

repeatedly after the First Arrest, ostensibly to conduct more "administrative searches"—led a group of officers on a raid of the plaintiffs' pawnshop. This time, he had a warrant to search the pawnshop, including its safe. During the raid, Marti again arrested Cabrera. Again the charges were dropped. Shortly thereafter, plaintiffs added new claims to their complaint. They also ask this Court to declare that New York City Charter, Chapter 18, § 436 ("Section 436"), which, *inter alia*, regulates the inspection of pawnshops, is unconstitutional under both the Fourth Amendment to the U.S. Constitution and article I, § 12 of the New York State Constitution.

The defendants, the City of New York ("City"), New York City Police Department ("NYPD"), Commissioner of Police Raymond Kelly ("Kelly") and Sergeant Ron Marti ("Marti"), move for summary judgment (1) dismissing the NYPD from this lawsuit, because it is a non-suable entity under Chapter 17, Section 396 of the New York City Charter; (2) dismissing the claims against Kelly, because he was not personally involved in the events giving rise to this lawsuit; (3) dismissing all claims against Marti and Kelly arising from the arrest of Brian Cabrera on January 23, 2008 ("First Arrest"), because their actions were lawful; (4) dismissing all claims against Marti and Kelly on the basis of qualified immunity; and (5) dismissing plaintiffs' *Monell* claim. Defendants also argue that any remaining state law claims, including those based on the New York State Constitution, should be dismissed for a lack of subject matter jurisdiction, because all of the plaintiffs' federal claims must be dismissed.

In addition to opposing the defendants' motion, plaintiffs cross-move for discovery, pursuant to Federal Rule of Civil Procedure 26.

For the following reasons, defendants' motion is granted in part and denied in part. Plaintiffs' cross-motion is denied.

## Discussion

### I. The Law of Administrative Searches of Commercial Premises

#### A. Federal Law

The Supreme Court long has recognized that, "The Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). The protection that the Fourth Amendment provides against warrantless searches, however, is not absolute. "Certain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Id.* at 313, 98 S.Ct. 1816 (internal citation omitted). Thus, under certain circumstances, a legislative scheme that authorizes a warrantless administrative search of a business is not considered constitutionally objectionable. *See Donovan v. Dewey*, 452 U.S. 594, 598, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). "Where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *New York v. Burger*, 482 U.S. 691, 702, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

A court uses a three-part test to determine whether a warrantless administrative search is reasonable within the meaning of the Fourth Amendment. The Supreme Court clarified the contours of this test in *Burger*, 482 U.S. 691, 107 S.Ct. 2636. In that case, the defendant owned and operated a junkyard in New York. *Id.* at 693, 107 S.Ct. 2636. One day, five NYPD officers

entered defendant's junkyard to conduct an administrative inspection of his business, pursuant to N.Y. Veh. & Traf. Law § 415–a5. *Id.* at 693–94, 107 S.Ct. 2636. The officers asked to see defendant's junkyard license and business records, which the law required defendant to keep. Defendant could not give the officers what they wanted because he did not have a license or business records. *Id.* at 694–95, 107 S.Ct. 2636. So, the officers announced that they were going to conduct an inspection of the property. *Id.* at 695, 107 S.Ct. 2636. As they performed this search, the officers discovered stolen vehicles and parts on the business' grounds. *Id.* Subsequently, defendant was charged with five counts of possession of stolen property and one count of unregistered operation as a vehicle dismantler in violation of § 415–a1. *Id.* at 695–96, 107 S.Ct. 2636.

At a hearing in Kings County Supreme Court, defendant moved to suppress the evidence gathered during the inspection on the ground that § 415–a5 was unconstitutional. *Id.* at 696, 107 S.Ct. 2636. The trial court denied the motion, and the Second Department affirmed. *Id.* at 696–97, 107 S.Ct. 2636. The New York Court of Appeals, however, reversed, holding that the statute violated the Fourth Amendment to the U.S. Constitution. *Id.* at 697, 107 S.Ct. 2636.

The United States Supreme Court disagreed, and held that the search fell within the exception to the warrant requirement for administrative inspections of pervasively regulated industries. *Id.* at 703, 107 S.Ct. 2636. In so doing, the Court announced that a warrantless search of a closely regulated industry would be considered reasonable when three conditions are met: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "warrantless

inspections must be necessary to further the regulatory scheme"; and (3) the administrative scheme at issue "must provide a constitutionally adequate substitute for a warrant." *Id.* at 702–03, 107 S.Ct. 2636 (internal quotations and citations omitted). To satisfy the last condition, the scheme must advise the owner of the property that a search is being made pursuant to the law, and be properly tailored to define the scope of the search and limit the discretion of the inspecting officers. *Id.* at 703, 107 S.Ct. 2636 (noting that the scheme must be "carefully limited in time, place and scope" (*quoting United States v. Biswell,* 406 U.S. 311, 315, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972))).

After concluding that an automobile-junkyard business qualified as a pervasively regulated industry *id.* at 703–04, 107 S.Ct. 2636, the Supreme Court held that § 415–a5 satisfied the conditions for a warrantless inspection. The first condition was met because motor vehicle theft had become a significant social problem, and, at least in part, the problem of automobile theft was associated with the junkyard industry. *Id.* at 708, 107 S.Ct. 2636. Because regulating a junkyard through administrative inspections helped to eradicate car theft, the second condition was satisfied. *Id.* at 709, 107 S.Ct. 2636 ("The State rationally may believe that it will reduce car theft by regulations that prevent automobile junkyards from becoming markets for stolen vehicles and that help trace the origin and destination of vehicle parts."). Finally, § 415–a5 provided an adequate substitute for a warrant, because the statute informed the junkyard owner that his business would be inspected, specified that inspections only could be done during regular business hours and limited such searches to the business records and any vehicles or parts on the premises that were subject to the statute's record keep-

ing requirement. *See id.* at 711–12, 107 S.Ct. 2636.

## B. New York Law

New York's State Constitution, article I, § 12, affords greater protection against warrantless searches than the U.S. Constitution. The New York Court of Appeals made this clear in its decision in *People v. Scott*, 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328 (1992)[1] (hereinafter *Keta*) where it held that the same statute previously found constitutional in *Burger, supra*, 482 U.S. 691, 107 S.Ct. 2636 (N.Y. Veh. & Traf. Law § 415–a(5) (hereinafter, " § 415–a (5)"))[2] was unconstitutional under New York's Constitution.

In *Keta*, the defendant owned and operated a vehicle-dismantling business. A team of five NYPD officers went to the defendant's premises to conduct an administrative search, pursuant to § 415–a(5),[3] which authorizes the police to conduct warrantless searches of junkyards to determine whether such businesses are trafficking in stolen automobile parts. During the inspection, the police discovered some stolen car parts on the business' grounds. They also determined that the defendant's "police book"—a record the defendant needed to keep as part of his business—did not properly document the parts at issue.

After the administrative search, the police obtained a warrant to search the rest of the premises. They found 35 additional car parts that had been reported stolen. The defendant was charged with multiple counts of criminal possession of stolen property in the third degree. Before trial, he moved to suppress the evidence by arguing that the administrative search that provided probable cause for the issuance of the warrant violated his state constitutional rights.

Notwithstanding *Burger*, the New York Court of Appeals concluded that § 415–a(5) "violate[d] the privacy rights encompassed within article I, § 12 of the New York State Constitution." *Keta*, 79 N.Y.2d at 495, 583 N.Y.S.2d 920, 593 N.E.2d 1328. New York's highest court expressly rejected the City's argument that the reasoning in *Burger* applied to New York's constitutional guarantees against unreasonable governmental intrusions:

> We therefore conclude that, in the final analysis, our constitutional privacy guar-

---

1. In this case, the New York Court of Appeals heard appeals from two cases, *People v. Scott* and *People v. Keta*. Both dealt with the constitutionality of police searches under state law. Since plaintiffs' arguments rely on the issues addressed in *Keta*. the Court, like the parties, will call the case by that name.

2. In relevant part, § 415–a(5) provides:

 Every person required to be registered pursuant to this section shall maintain a record of all motor vehicles, trailers, and major component parts thereof, coming into his possession together with a record of the disposition of any such motor vehicle, trailer or part thereof and shall maintain proof of ownership for any motor vehicle, trailer or major component part thereof while in his possession. Such records shall be maintained in a manner and form prescribed by the commissioner.... Upon re-

 quest of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.... The failure to produce such records or to permit such inspection on the part of any person required to be registered pursuant to this section as required by this paragraph shall be a class A misdemeanor.

 *Keta*, 79 N.Y.2d at 494 n. 1, 583 N.Y.S.2d 920.

3. As will readily be perceived, § 415–a(5) is the junkyard analogue to the pawnshop statute at issue in this case

antee generally requires probable cause and warrants, with their attendant case-by-case judicial oversight, as a condition to official entries on, and searches of, private premises. While we have from time to time been willing to recognize exceptions to these requirements in certain narrowly circumscribed situations, we have never suggested the existence of a generalized, wholesale exception to the warrant and probable cause requirements that may be invoked whenever necessary to enhance the effectiveness of the State's law enforcement efforts. Rather, we have always insisted that there be some additional particularized factor, such as the exigencies of "hot pursuit" or the existence of a business that is truly "closely regulated," in order to justify dispensing with one or both of those constitutional prerequisites. Since none of those special factors is present here, the search of defendant's premises was constitutionally impermissible.

*Id.* at 501, 583 N.Y.S.2d 920.

The *Keta* court obviously either rejected the Supreme Court's conclusion that junkyards were a "pervasively regulated" industry, or drew some (to this Court) imperceptible distinction between "pervasively" and "closely" regulated businesses. I say this because the New York Court of Appeals recognized that the search of a "closely regulated" business might well be justified without a warrant.

In addition, it is evident that New York's highest court disagreed with the Supreme Court's conclusion that § 415–a(5) provided the necessary safeguards to allow a warrantless inspection of a business. It concluded that, in certain narrowly circumscribed cases, a comprehensive administrative program that authorizes warrantless searches could be constitutional, but only if the law authorizing the search "provide[d] for such certainty and

regularity of application as to be a constitutionally adequate substitute for a warrant." *Id.* at 502, 583 N.Y.S.2d 920 (*citing Donovan, supra,* 452 U.S. at 603, 101 S.Ct. 2534). Unquestionably, the "adequate substitute for a warrant" language is borrowed from *Burger* and its progeny, but apparently the *Keta* court concluded that the warrantless exception requirement of New York's Constitution was narrower than its federal counterpart. *Id.*

### The Grasso Memorandum

*Keta* did not, of course, deal with pawnshops. However, there is a corresponding statute—N.Y. City Charter, Ch. 18, § 436—that does. Section 436 provides:

> The commissioner shall possess powers of general supervision and inspection over all licensed or unlicensed pawnbrokers, vendors, junkshop keepers, junk boatmen, cartmen, dealers in second-hand merchandise and auctioneers within the city; and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession. A refusal or neglect to comply in any respect with the provisions of this section on the part of any pawnbroker, vendor, junkshop keeper, junk boatman, cartman, dealer in second-hand merchandise or auctioneer, or any clerk or employee of any thereof shall be triable by a judge of the criminal court and punishable by not more than thirty days' imprisonment, or by a fine of not more than fifty dollars, or both.

N.Y. City Charter, Ch. 18, § 436.

In the wake of *Keta*, the Deputy Commissioner for Legal Matters of the NYPD, George A. Grasso, issued a memorandum entitled, "GUIDELINES FOR THE INSPECTION OF PAWNBROKER AND SECOND–HAND DEALERS BUSI-

NESS." (Harold Dambrot Affidavit (hereinafter, "Dambrot Aff.") at 4–8.) The memo (or "Grasso memo"), issued to the Chief of Detectives, provided guidelines designed to insulate the NYPD from allegations of unlawful search and seizure in connection with administrative inspections of pawnshops. The memo concluded:

in order to insure that administrative searches of pawnbroker and second-hand dealer businesses conducted by this Department survive constitutional challenge, Department guidelines must insure that such searches are necessary to further the objective of enforcing the rules and regulations pertaining to such businesses. *Members of the service may inspect the books and records of pawnbroker and second-hand dealer businesses, request to see licenses, demand to examine and seize stolen property. Such inspections should be conducted on a regular basis as part of an on going program to enforce licensing and record keeping requirements.* Joint operations with the licensing agency, the Department of Consumer Affairs, would help insulate this Department from a *Keta* claim that such inspections are being conducted to seize evidence of criminal activity. *Inspections or searches conducted for the purpose of finding evidence of criminal activity must be conducted pursuant to a search warrant or exceptions to the search warrant requirement, i.e., consent or plain view.* In addition, when an administrative search of a pawnbroker or second-hand dealer's book and or records indicates the presence of criminal activity, the premises should be secured and a search warrant obtained.

(*Id.* at 8 (emphasis added).)

The memo instructed the police to observe the following guidelines when conducting administrative searches of pawnshops in order to comply with the dictates of *Keta:*

1. Prepare a listing of all businesses within a precinct/borough operating as a pawnbroker or second hand dealer.

2. Perform inspections of such businesses on a regular basis as part of Department authorized pawnbroker and second hand dealer inspections program. A plan should be formulated to determine which business in a specific precinct/borough will be visited. You may inspect *all* such businesses or randomly select [text omitted because it is illegible]. You may not, however, select businesses for inspection solely because there exists some suspicion that the business is engaged in criminal activity or solely for the purpose of enforcing the criminal law. (Emphasis in original).

3. Request the assistance of the Department of Consumer Affairs which licenses such pawnbroker and second-hand dealer businesses.

4. Visit pawnbroker and second-hand dealer businesses during regular business hours.

5. Request to inspect required books and records.

6. Review required records for accuracy and completeness.

7. If records are incomplete or a request to inspect such records is denied or the business being inspected lacks the appropriate Department of Consumer Affairs license, issue a Universal Summons returnable to Criminal Court to the pawnbroker or second-hand dealer or employee in charge under the appropriate Administrative Code

section. All Administrative Code violations pertaining to pawnbroker and second-hand dealer businesses are class A misdemeanors.

8. If, during an inspection or otherwise, a uniformed member of the service develops probable cause to believe that a particular pawnbroker or second-hand dealer business in [sic] engaged in criminal activity, the premises should be secured and a search warrant obtained before a search of the premises is commenced.

9. *Apparently stolen property, evidence, or contraband **in plain view** may be seized* [text omitted because it is illegible] *however its evidentiary or contraband nature must be apparent. Any handling or manipulation of the property, whether by a* [word omitted because it is illegible] *of the service or by another at the request of a member of the service, will constitute an unlawful search.* (Emphasis added).

10. When a complainant identifies stolen property in the possession of a pawnbroker or second-hand dealer business, a uniformed member of the service may demand that such property be produced. If a pawnbroker or second-hand dealer business refuses to comply with such demand and the complaint's property is not in plain view, issue a Universal Summons returnable to Criminal Court pursuant to Administrative Code section 20–272. If there is probable cause to believe that such pawnbroker or second-hand business is in possession of stolen property or is otherwise engaged in criminal activity, secure

the premises and obtain a search warrant.

11. All inspections of second hand dealers and pawnbrokers should be carefully documented in a log or Department form designed for that purpose. . . .

(*Id.* at 6–7.)

## II. The January 23, 2008 and May 15, 2008 Arrests of Brian Cabrera and Searches of 5 Borough Pawn

### A. Facts

#### *The First Arrest*

On January 23, 2008, around 1:00 PM, a group of about a dozen police officers, led by Sergeant Marti, went to plaintiffs' pawnshop, 5 Borough Pawn, LLC, in Queens, New York. (Am. Compl. ¶ 14.) Marti told Brian Cabrera, who was tending the pawnshop at the time, that he and his fellow officers were there to conduct an administrative search of the business, pursuant to Section 436.

Plaintiffs, having operated their pawnshop for nearly 10 years, were not strangers to such a demand. (Affidavit of Brian Cabrera (hereinafter, "B. Cabrera Aff.") ¶ 2.) As is plaintiffs' practice, Brian Cabrera offered Marti the pawnshop's books and records for inspection. (*Id.*) Allegedly, however, Marti was not satisfied with such an offer. (Am. Compl. ¶ 15.) He demanded that Cabrera open the pawnshop's safe so that he could see what was inside. (*Id.* ¶ 16.)

Cabrera refused to let Marti search the safe without a warrant. (*See id.* ¶¶ 19–20.) In response, Marti said, "We don't require any warrants . . . the New York City Charter § 436[ ] allows us to do this." (*Id.* ¶ 20 (ellipsis in the original).) Marti allegedly threatened Cabrera by telling him that, if he continued to refuse to give the police access to the pawnshop's safe, the

NYPD would arrest Cabrera and close the store. (*Id.* ¶¶ 21–22.) Cabrera continued to insist on a warrant, and Marti arrested him ("First Arrest"). (*Id.* ¶ 24.) Cabrera spent the night in jail. He was released the following day. (*Id.* ¶ 45.)

The criminal complaint filed against Cabrera for the First Arrest does not mention anything about the safe. Instead, it says Cabrera was arrested because he refused to let Marti "see the business records" without a warrant. (Declaration of Michael Gertzer (hereinafter, "Gertzer Decl.") Ex. B.)

On September 4, 2008, the underlying criminal charges against Cabrera stemming from the First Arrest were dismissed.

After the First Arrest, Marti, accompanied by other NYPD officers, allegedly returned to 5 Borough Pawn to do more "administrative searches." (Am. Compl. ¶ 26.) During these visits, Marti allegedly threatened to "close the store down." (*See, e.g.,* ¶ 28.)

For example, on February 8, 2008, Marti went to the pawnshop and demanded the plaintiffs give him the pawnshop's business records and allow his police crew to inspect certain jewelry on the premises. (*Id.* ¶¶ 27, 95.) Plaintiffs responded by calling their attorney, because they believed that Marti's demands were improper. (*Id.* ¶¶ 96–97.) The attorney talked to Marti, and Marti allegedly said that he would "shut down" the plaintiffs' business and arrest them if they did not do what he asked. (*Id.* ¶¶ 28, 97.) However, Marti never acted on this threat. After the conversation with plaintiffs' attorney, Marti and his fellow officers left the pawnshop without conducting an inspection. (*Id.* ¶ 99.)

On March 29, 2008, Marti returned to the pawnshop with some of his fellow officers. He demanded copies of the pawnshop's business records, so that he could take them back to his precinct. (*Id.* ¶ 101.) Plaintiffs started to take steps to make the copies and, as before, called their attorney. (*Id.* ¶¶ 103–04.) Marti told the attorney, "I will close the business down ... because he (Cabrera) is not doing as (I) asked ... and ... nobody dares to defie [sic] us like Cabrera does." (*Id.* ¶ 104 (ellipsis and parentheses in the original).)

By this time, plaintiffs had served a "Notice of Claim" against the City for the First Arrest. (*Id.* ¶ 105.) Plaintiffs' attorney told Marti that the plaintiffs intended to file a civil rights lawsuit against the City. Marti told the attorney that the lawsuit would not cause him to change his behavior as a police officer. (*Id.* ¶¶ 105–06.) After that conversation, Marti left without conducting an inspection.

### The Second Arrest

Sergeant Marti returned to 5 Borough Pawn on May 15, 2008. This time he was not there to conduct an administrative search. He had a warrant to search the pawnshop, including the safe, and he, along with other NYPD officers, allegedly ransacked the pawnshop to search for stolen property. (*Id.* ¶¶ 112, 114.) The NYPD arrested Brian Cabrera and another employee, Ryan Ali, charging them with trafficking in stolen merchandise. (*See id.* ¶ 113; Gertzer Decl. Ex. C.)

Before the warrant issued, the NYPD had conducted a "sting" operation on the plaintiffs' pawnshop.

On April 16, 2008, undercover officer Sergeant Danielle Raia went to 5 Borough Pawn twice. (Gertzer Decl. Ex. D, ¶ 4.) First, she "pawned" a gold medallion for $240.00. (*Id.*) When she did so, Raia told the pawnshop's employee—who is identified as a "male, Hispanic, 6′0″ ", 165 lbs.,

30–35yrs., heavy build" (*id.*)—that the medallion was stolen. (*Id.*) This did not stop the employee from completing the transaction. (*Id.*) The employee also never asked for Raia's personal identification information, as required by law. (*Id.*)

Raia returned later that day. She told the same employee that she had some "stolen" merchandise (a gold ring) to sell. (*Id.*) As before, the employee took the ring and asked no questions. (*Id.*)

On May 6, 2008, Raia returned to 5 Borough Pawn for a third time to sell more "stolen" merchandise. (*Id.*) This time, she sold three gold rings and a "nameplate" for a total of $60.00. (*Id.* ¶ 5.) The same employee took the items—no questions asked. (*Id.*)

On May 14th, based on an affidavit by police officer Keith Doumas, who described Sergeant Raia's undercover work, The Honorable Deborah Stevens Modica of Queens Criminal Court issued a warrant authorizing the police to search 5 Borough Pawn, LLC. (Gertzer Decl. Ex. C.) The warrant allowed the police to search the entire pawnshop for the stolen property and to seize the pawnshop's computer for forensic examination. (*Id.*) It was not an arrest warrant. (*Id.*)

The NYPD executed the warrant the next day. Plaintiffs allege that Marti arrested Cabrera and Ali as soon as he arrived—before conducting the search ("Second Arrest"). (Am. Compl. ¶ 113.) They also allege that Marti and his fellow officers deliberately damaged the pawnshop's property so that the business would be shut down. (*Id.* ¶¶ 114–15.) After the officers finished "dismantling" the pawnshop, the plaintiffs were unable to reopen their business for several weeks.

The following day, May 16, 2008, the Queens District Attorney dismissed the pending criminal charges against Cabrera arising out of the Second Arrest. (*Id.* ¶ 119.) The D.A. dismissed all pending charges against Ali on May 17, 2008. (*Id.*) Plaintiffs allege that the D.A. dismissed the charges because the NYPD's warrant was "frivolous and improper." (*Id.*)

Plaintiffs deny that 5 Borough Pawn ever accepted stolen property from Raia, or failed to record the personal identification information of its customers. (B. Cabrera Aff. ¶¶ 4–5.) Instead, they assert that the NYPD, led by Marti, conducted the May 15th search in retaliation for this lawsuit. (Am. Compl. ¶ 121.)

**B. Procedural History**

Plaintiffs filed and served their initial complaint on April 23, 2008. Their initial claims were limited to the events arising out of the First Arrest.

On July 3, 2008, this Court placed the case on the Suspense Calendar until the criminal case against Brian Cabrera was over. On September 11, 2008, the Court lifted this stay because the criminal charges against Cabrera had been dismissed. The Court held an initial pre-trial conference on October 17, 2008. At that conference, the Court granted leave for plaintiffs to file an amended complaint, to incorporate claims arising out of the May 15, 2008 arrests of Brian Cabrera and Ryan Ali ("Second Arrest"). Plaintiffs filed the amended complaint on October 27, 2008.

*Plaintiffs' claims against Marti*

Plaintiffs bring § 1983 claims against Marti for: (1) falsely arresting and imprisoning Cabrera on January 23, 2008; (2) demanding to search the pawnshop's safe on January 23, 2008; (3) demanding to search plaintiffs' pawnshop on February 8 and March 29, 2008; and (4) falsely arresting and imprisoning Cabrera and Ali on May 15, 2008. In addition, plaintiffs bring a variety of state law claims against Marti.

*Plaintiffs' claims against Kelly and the NYPD*

Plaintiffs claim that Kelly and the NYPD violated § 1983 by carrying out or maintaining unconstitutional policies for pawnshop searches. Under this theory, they claim that Kelly and the NYPD should be held liable for: (1) Marti's demand to search the pawnshop's safe on January 23, 2008; (2) Marti's alleged false arrest and imprisonment of Cabrera on January 23, 2008; and (3) Marti's demand to search the pawnshop on February 8 and March 29, 2008. Plaintiffs claim that the NYPD should be held liable for Marti's alleged false arrest and imprisonment of Cabrera and Ali on May 15, 2008. In addition, plaintiffs bring a variety of state law claims against Kelly and the NYPD.

*Plaintiffs' claims against the City*

Plaintiffs bring a *Monell* claim against the City for the events arising out of the First Arrest. They argue that Marti's demand to search the pawnshop's safe on January 23, 2008, and arrest of Cabrera on the same day show that the City has an unconstitutional search and arrest policy for pawnshops.

## III. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## IV. Defendants' Motion to Dismiss the Plaintiffs' State Law Claims For a Lack of Jurisdiction is Denied.

This Court retains supplemental jurisdiction over plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367. Plaintiffs' state law claims implicate similar issues as their federal claims, and arise out of the same set of facts. As discussed above, the Court is not dismissing all of plaintiffs' federal claims. So, at this point in the lawsuit, there is no reason to send plaintiffs' state law claims to state court, because they present similarly unresolved issues.

## V. Plaintiffs' claims against the NYPD are dismissed.

■ Plaintiffs concede that they cannot sue the NYPD. Chapter 17, § 396 of the New York City Charter provides that, "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not that of any agency except where otherwise provided by law." Since the NYPD is an agency of New York City, it is a non-suable entity, and all claims against it must be dismissed. *See Sash v. City of New York*, 05 Civ. 1544, 2006 WL 2474874, at *4 (S.D.N.Y. Aug. 11, 2006).

## VI. Plaintiffs' Claims Against Marti.

In defendants' motion for summary judgment, they move to dismiss the claims arising out of the First Arrest against Kelly and Marti for two reasons: (1) their actions were lawful; and (2) they are shielded from suit on the basis of qualified immunity. As will become apparent, the defendants' assertion of qualified immunity and "lawfulness" meld together in certain instances.

## A. Federal Standard for Qualified Immunity

■ Government officials performing discretionary functions are entitled to qualified immunity "from federal constitutional claims . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) *overruled in part by, Pearson v. Callahan*, 555 U.S. ——, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Supreme Court indicated that the availability of qualified immunity ought to be decided by a court at the earliest possible opportunity—preferably at the outset of the case, which is a point at which plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial. This is because qualified immunity protects the officer not just from liability, but from having to endure the rigors of litigation. *See Pearson*, 555 U.S. at ——, 129 S.Ct. at 815 (citing cases); *see also Ashcroft v. Iqbal*, 556 U.S. ——, 129 S.Ct. 1937, 1945–46, 173 L.Ed.2d 868 (2009). Thus, as the Second Circuit explained in *Stephenson v. Doe*, 332 F.3d 68 (2d Cir.2003), when determining a motion to dismiss on qualified immunity grounds in advance of full merits discovery, the plaintiff's version of the facts is presumed to be true, and the question to be answered is whether the defendant officer, confronted with the facts as alleged by plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right. *See also Kelsey v. The County of Schoharie*, 567 F.3d 54, 60–61 (2d Cir.2009).

The inquiry has two steps, and under the old rule of *Saucier*, the steps had to be addressed in a particular order. *See Pear-son*, 555 U.S. at ——, 129 S.Ct. at 815–16 (discussing old approach). First, a court had to determine whether, taking the facts in the light most favorable to the party asserting the injury, a constitutional infraction had been committed. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. If the answer to that question was yes, then, and only then, could a court proceed to the second step, requiring a court to decide whether a reasonable official in defendant's position (as that position is described by plaintiff) ought to have known that he was violating plaintiff's federal constitutional rights by doing what plaintiff alleges he did. *Id.* at 201–02, 121 S.Ct. 2151. Ordinarily, under this last step, the relevant inquiry will be whether the law is in fact well-settled—because if it is, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Claims that a public officer made a reasonable mistake of fact, "go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity." *Stephenson*, 332 F.3d at 78 (*citing Saucier*, 533 U.S. at 205–06, 121 S.Ct. 2151).

The Supreme Court's recent decision on qualified immunity, *Pearson*, 555 U.S. at ——, 129 S.Ct. 808, finally recognized what lower courts applying the doctrine have known for years—that in many cases, the procedure outlined in *Saucier* was convoluted and unworkable. The Court held, "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818; *see*

*also Kelsey,* 567 F.3d at 60–61. This is because, "There are circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 820. For example, when a court may easily decide that the alleged violation of the constitutional right was not clearly established, there is no need to reach the constitutional question. *Id.* Likewise, "A constitutional decision resting on an uncertain interpretation of state law is also of doubtful precedential importance" *id.* at 819, because such a decision depends on a "federal court's uncertain assumptions about state law." *Id.* (internal quotation and citation omitted).

Although *Pearson* frees a court from *Saucier'*s "rigid order of battle," a court is still free "to make a 'threshold inquiry' as to the violation of a constitutional right." *Kelsey,* 567 F.3d at 61. That constitutional inquiry is appropriate when "discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Id.* (*quoting Pearson,* 129 S.Ct. at 818.)

### B. New York's Version of Qualified Immunity

 The doctrine of qualified immunity is generally understood to only protect government officials from federal, not state, causes of action. *Jenkins v. City of New York,* 478 F.3d 76, 86 (2d Cir.2007). New York common law, however, fills this gap by providing government officials with a similar form of protection against state law claims. *Id.; see Jones v. Parmley,* 465 F.3d 46, 63 (2d Cir.2006) "New York law ... grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones,* 465 F.3d at 63 (*citing Blouin ex rel.*

*Estate of Pouliot v. Spitzer,* 356 F.3d 348, 364 (2d Cir.2004), and *Arteaga v. State,* 72 N.Y.2d 212, 216–17, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988)). "To be entitled to qualified immunity, it must be established that it was objectively reasonable for the police officers involved to believe that their conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether their conduct was proper." *Allen v. City of New York,* 03 Civ. 2829, 2007 WL 24796, at *24 (S.D.N.Y. Jan. 3, 2007) (*quoting Brown v. State,* 12 Misc.3d 633, 648, 814 N.Y.S.2d 492 (N.Y.Ct.Cl.2006)) (other internal citations and quotations omitted). Thus, as is true of federal law, an officer's entitlement to qualified immunity under New York law depends on the reasonableness of his actions. *Jones,* 465 F.3d at 64 (citing cases). However, the reasonableness of an officer's action is judged with references to state law and the state, not the federal, constitution. *Allen,* 2007 WL 24796, at *24 (*citing Doyle v. Rondout Valley Cent. Sch. Dist.,* 3 A.D.3d 669, 670–71, 770 N.Y.S.2d 480 (3d Dep't 2004)).

### C. Marti's January 23, 2008 demand to search the pawnshop's safe did not violate plaintiffs' constitutional rights.

Plaintiffs allege that Marti violated their federal constitutional right to be free from unreasonable searches and seizures merely by demanding that the police be given access to the pawnshop's safe without a warrant on January 23, 2008. Marti argues that, pursuant to Section 436, he had a right to search the pawnshop's safe without a warrant. He also argues that he reasonably believed that his actions were lawful, and so is entitled to qualified immunity.

 It is not alleged that Marti actually searched the safe on January 23. Rath-

er, it is alleged that he demanded to do so, and when access was denied, he caused Cabrera to be arrested. The arrest will be discussed below. Focusing solely on the demand: as the above discussion of the law makes clear, the demand was illegal under state (although probably not under federal) law. However, the fact that no search took place means that plaintiffs' Fourth Amendment rights could not possibly have been violated. Demanding to be allowed to search the safe, and threatening to arrest Cabrera if Marti was not allowed into the safe, are not actionable because threatening to violate a person's constitutional rights cannot be the basis for a claim under § 1983. *Cotz v. Mastroeni,* 476 F.Supp.2d 332, 362 (S.D.N.Y.2007) (*citing Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)).

In *Cotz,* the district court granted the defendants' motion for summary judgment on the plaintiff's § 1983 claim arising out of an officer's threat to conduct an alleged unconstitutional search. The plaintiff went with her husband to attend a town hall meeting about the then recent September 11 terrorist attacks. *Id.* at 339. All attendees of the meeting had to go through a metal detector. *Id.* As the plaintiff approached the metal detector with her husband, a police officer threatened to strip search her. *Id.* The plaintiff immediately called the town's attorney, and she was allowed to enter the meeting without further incident. The court held that the officer's mere threat to conduct a search did not violate the plaintiff's constitutional rights. *Id.* at 362.

Because Marti's threats did not in and of themselves work any constitutional viola-

tion, it is not necessary to reach the question of qualified immunity. As the Second Circuit observed in *Stephenson,* 332 F.3d at 78–79, Marti is entitled to dismissal of this aspect of the § 1983 claim, not because of qualified immunity, but because his threats did not violate anyone's constitutional rights.

**D. Marti is not entitled to federal or state qualified immunity for arresting Cabrera on January 23, 2008.**

Cabrera contends that his constitutional rights were violated when he was arrested without probable cause on January 23. Marti alleges that he is entitled to qualified immunity under federal and state law for that arrest.

Marti is wrong. Qualified immunity does not cloak him for this arrest.

 The brief survey of state and federal law set forth above reveals that Marti would have been entitled to qualified immunity from suit under § 1983 if he had actually searched the safe on January 23, 2008. Federal law about the constitutionality of going into the safe during an administrative search authorized by Section 436 was *at best* unsettled at that date; more likely it had been resolved favorably to defendants. While the Supreme Court's decision in *Burger* addressed the statute authorizing the administrative search of junkyards rather than the one that authorized similar incursions in pawnshops, the Supreme Court held that any inventory on the premises of a pervasively regulated businesses could be subjected to warrantless searches, *Burger,* 482 U.S. at 709–12, 107 S.Ct. 2636,[4] and actually observed that

---

4. In the line of cases dealing with administrative searches under the Fourth Amendment, the Supreme Court has consistently held that police may inspect items on the premises of a pawnshop without a warrant—including

items in a locked storage unit, like a safe—not just books and records. *See, e.g., United States v. Biswell,* 406 U.S. 311, 317, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (holding that a warrantless search of a pawnshop's locked

pawnshops were "pervasively regulated" in New York. *Id.* at 706–07, 107 S.Ct. 2636. A reasonable police officer in Marti's position could certainly have believed that it was constitutional for him to look inside the safe at 5 Borough Pawn without violating the United States Constitution; he would at the very least have been entitled to qualified immunity from federal constitutional claims if he had actually searched the safe on January 23, 2008.

Plaintiffs argue that, because the New York State Constitution provides New Yorkers with broader protections than does the Fourth Amendment to the United States Constitution, the scope of the Fourth Amendment, with its attendant expectation of privacy, in New York should be found to be co-terminous with the more protective state constitutional standard. This argument was rebutted by my colleague Judge Sand in *We Buy, Inc. v. Town of Clarkstown State of New York*, 06 Civ. 1794, 2006 WL 3016314, at **5–6 (S.D.N.Y. Oct. 20, 2006), a case with facts remarkably similar to this one (except that a search that was illegal under state but not federal law actually did take place). Relying on *United States v. Pforzheimer*, 826 F.2d 200 (2d Cir.1987), which held that federal courts must apply the exclusionary rule under federal law—even when the evidence gathered by state officials violated state constitutional law—Judge Sand found it well settled in this Circuit that alleged violations of state constitutional law cannot, by themselves, form the basis of a federal constitutional violation when state constitutional protections are broader than their federal counterparts.

■ Intuitively, such a rule makes sense. The United States Constitution provides the floor for the protections af-

forded citizens—not a ceiling. Under our dual system of sovereignty, states are free to expand upon constitutional safeguards and give the citizens of their state greater protections, but only under *state law*. "State constitutions preceded the Federal Constitution and were obviously intended to have independent significance.... Thus, whether the national minimum set by the Federal Constitution is high or low, state constitutions have their own unique origins, history, language, and structure—all of which warrant independent attention and elucidation." *Delaware v. Van Arsdall*, 475 U.S. 673, 706–707, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (Stevens, J., dissenting). As former Chief Judge Judith Kaye noted in her concurring opinion in *Keta, supra*, 79 N.Y.2d at 504–05, 583 N.Y.S.2d 920, 593 N.E.2d 1328, "A State court decision that rejects Supreme Court precedent ... does indeed establish higher constitutional standards locally." However, a state's decision to expand a citizen's rights under state constitutional law could not logically expand the protection provided by the U.S. Constitution. Accordingly, once a state departs from a federal constitutional standard, the citizen's enhanced right, which is strictly a product of state law, cannot be vindicated under § 1983.

■ But that does not settle the issue of whether Marti is entitled to qualified immunity for arresting Cabrera on January 23. In analyzing § 1983 claims for unconstitutional false arrest and imprisonment, federal courts look to the law of the state in which the arrest occurred—not federal law. *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir.2004); *Washpon v. Parr*, 561 F.Supp.2d 394, 402 (S.D.N.Y. 2008). And under state law, there was no

storeroom, pursuant to the Gun Control Act of 1968, did not violate the Fourth Amendment.)

probable cause—or even arguable probable cause—to arrest Cabrera for denying the police access to the safe. Rather, under state constitutional law, implemented by NYPD policy, Marti was expressly barred from arresting Cabrera for keeping him out of the safe in the absence of a warrant.

 Under New York law, "a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996); *see also Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir.1999) (noting that a § 1983 claim for false arrest based on the Fourth Amendment is substantially the same for false arrest under New York law). "Under New York law, the elements of a false imprisonment claim are: (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Weyant*, 101 F.3d at 853 (internal quotations and citations omitted, brackets in the original). The existence of probable cause to arrest is a complete defense. *See Covington*, 171 F.3d at 122; *Jones v. J.C. Penny's Dep't Stores Inc.*, 317 Fed.Appx. 71, 73–74 (2d Cir.2009). Probable cause is determined at the time of the arrest. *Reinhart v. City of Schenectady Police Dep't*, 599 F.Supp.2d 323, 328 (N.D.N.Y.2009) (*citing Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)).

 In addition, "Even if there was no probable cause to arrest, a police officer may nonetheless by immune from a claim of false arrest under the doctrine of qualified immunity if 'either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on

whether probable cause test was met.' " *Washpon*, 561 F.Supp.2d at 403 (*quoting Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991)); *see also Lee v. Sandberg*, 136 F.3d 94, 102–03 (2d Cir. 1997) (applying same to false imprisonment claim). Courts call this additional test for qualified immunity "arguable probable cause"—which, as it sounds, "is more favorable to officers than the one for probable cause." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir.2004).

In New York, a police officer has probable cause to make an arrest for:

(a) Any offense when he has reasonable cause to believe that such person has committed such offense in his presence; and

(b) A crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise.

N.Y.Crim. Proc. Law § 140.10(1). If officers of reasonable competence could disagree about the existence of reasonable cause to arrest, the officer is entitled to qualified immunity.

 Marti argues that he is entitled to qualified immunity because he had probable cause to arrest Cabrera once Cabrera refused to let him look in the pawnshop's safe. But even under the more lenient "arguable probable cause" standard, this argument lacks merit. Cabrera was arrested for a purported violation of a city statute, so the legality of his arrest is not a function of whether Marti was privileged to enter the safe without a warrant under federal law. It is, rather, a function of whether there was probable cause to believe that Cabrera was violating Section 436 by keeping Marti out of the safe. The answer to that question is no.

Clearly no reasonable officer could have thought that he was privileged to arrest a

pawnshop owner who refused to allow him into a closed and locked safe without a warrant. The New York Court of Appeals' decision in *Keta* and the Grasso Memo—which was official NYPD policy—make it perfectly clear that police officers are not privileged, under the New York State Constitution, to invade safes without a warrant. Marti, like every other NYPD officer, is presumed to know about *Keta* and the Grasso Memo, and so to know that he was not privileged to arrest a pawnshop owner or employee for doing what Cabrera did. *The Grasso memo is quite clear—an officer is not allowed to make an arrest in such a situation.* The memo authorizes an officer to issue a citation, secure the premises, and obtain a warrant if he has probable cause to believe that the safe contains stolen property. Marti did none of these things. Instead, he made an arrest—the one thing he was explicitly not allowed to do.

Since Marti allegedly disobeyed express instructions (i.e., the Grasso memo) about what state law requires in the situation he confronted, neither probable cause nor arguable probable cause for the arrest exists, and Marti's motion for summary judgment declaring that he is shielded by qualified immunity for the First Arrest is denied.

### E. Marti is not entitled to state qualified immunity for the First Arrest.

Cabrera brings state law claims against Marti arising out of the First Arrest for false imprisonment and emotional distress. Marti argues (albeit in a footnote) that New York's version of qualified immunity protects him from being sued on these state law claims.

The question at the heart of Marti's state law qualified immunity defense for false imprisonment and emotional distress is whether his actions were objectively rea-

sonable on January 23rd. *See Jones,* 465 F.3d at 64 (noting the same). The answer to that question rests on the same set of facts and legal principles as plaintiffs' federal claim for false imprisonment. The Court's prior analysis applies and controls here. *See Id.* The reasonableness of Marti's arrest of Cabrera on January 23 is in material dispute. Accordingly, Marti is not entitled to state qualified immunity for plaintiffs' state law false imprisonment and emotional distress claims, because it was neither objectively reasonable nor arguably objectively reasonable for him to arrest Cabrera when probable cause was lacking—as was the case here. *See Fera v. City of Albany,* 568 F.Supp.2d 248, 260 (N.D.N.Y.2008).

### F. Plaintiffs' claims against Marti for his visits to their Pawnshop on February 8 and March 29, 2008 are dismissed.

Plaintiffs claims arising out of Marti's February 8 and March 29 visits take three forms: (1) Marti violated plaintiffs' Fourth Amendment rights by returning to 5 Borough Pawn to perform administrative inspections; (2) Marti violated plaintiffs' federal constitutional rights by threatening to use Section 436 to "shut down" their pawnshop; and (3) under New York law, Marti interfered with plaintiffs' business.

 As noted above, Marti's threats do not rise to the level of a Fourth Amendment violation. In fact, plaintiffs' complaints about Marti's threats to "shut down" their pawnshop are remarkably similar to the facts in *Cotz, supra.* Plaintiffs complain about what Marti merely threatened to do. Marti never acted on his threat to shut the pawnshop down; neither did he actually search the safe. Once plaintiffs' attorney told Marti to go away, he left. Without more, plaintiffs' claims do "not rise to the level of a consti-

tutional violation." *Cotz*, 476 F.Supp.2d at 362.

■ Moreover, it was no violation of federal constitutional law for Marti to perform repeated administrative inspections pursuant to Section 436. *Burger* effectively settled that as a matter of federal constitutional law. Furthermore, it is far from clear that Marti violated *state* law by returning to 5 Borough Pawn to perform subsequent administrative inspections. The Grasso memo, which was drafted to keep police conduct consistent with *Keta* and the state constitution, instructs the police to conduct regular inspections of pawnshops. Marti's behavior—going to the pawnshop three times in a three month period—is totally in keeping with these instructions.

■ It is for that reason that Marti is immune from plaintiffs' business interference claim under state law. There is nothing unreasonable about officers performing an administrative inspection that complies with the NYPD's guidelines on that issue. Accordingly, plaintiffs' business interference claim against Marti is dismissed. *See Allen*, 2007 WL 24796, at *24 (S.D.N.Y. Jan. 3, 2007).

**G. Marti is entitled to dismissal of the claim that he violated plaintiffs' constitutional rights by searching their pawnshop on May 15, 2008.**

Plaintiffs contend that Marti is not entitled to summary judgment dismissing their claim arising out of the May 15, 2008 search of the pawnshop. They contend that it was not objectively reasonable for Marti to rely on the warrant that had issued when he searched their pawnshop.

Plaintiffs are wrong. In fact, Marti is entitled to more than simply qualified immunity for searching the pawnshop on May 15, 2008; he is entitled to outright dismissal of the claim on the merits, because he did nothing wrong in searching the pawnshop pursuant to a properly issued warrant. *Stephenson*, 332 F.3d at 78–79.

■ A plaintiff who challenges an officer's reliance on a warrant carries a heavy burden. *See Golino*, 950 F.2d at 870. "A police officer who relies in good faith on a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity from personal liability for damages." *Simms v. Village of Albion, New York*, 115 F.3d 1098, 1106 (2d Cir. 1997) (citation omitted). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.... Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *United States v. Leon*, 468 U.S. 897, 921, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984).

■ However, an officer cannot blindly rely on the magistrate's probable cause determination. The officer's reliance must be objectively reasonable. *Simms*, 115 F.3d at 1106. Objective reasonableness is determined by asking whether "a reasonably well-trained officer would have known that the warrants were illegal despite the magistrate's authorization." *Id.* (*citing Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3430). "In making this determination, all of the circumstances ... may be considered." *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3430.

■ When a plaintiff alleges that the warrant was issued for improper reasons, "the plaintiff must make a substantial preliminary showing that the affiant

knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause.... Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause ... the shield of qualified immunity is lost." *Golino,* 950 F.2d at 870–71 (internal citations and quotations omitted). The substantial preliminary showing requirement exists to prevent fishing expeditions into the propriety of an otherwise presumed truthful warrant affidavit. *See United States v. Falso,* 544 F.3d 110, 125 (2d Cir.2008). A plaintiff does not make this showing by making conclusory claims that the events that were described in the warrant did not happen. *See Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations *must be accompanied by an offer of proof* .... Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* at 171, 98 S.Ct. 2674 (emphasis added).

Viewing the circumstances of this case objectively, Marti justifiably relied on the search warrant when he searched plaintiffs' business.

Plaintiffs do not argue that a reasonably well-trained officer would have known that the warrant issued in this case was illegal. Rather, they contend that even if it was reasonable for *other* officers to rely on the warrant, it was not objectively reasonable for Marti to do so, because *he* knew that the warrant was illegal. Plaintiffs claim that the events described in the warrant affidavit were made up, as part of a staged scheme to retaliate against them for filing this lawsuit.

Plaintiffs' contentions fall far short of making the substantial preliminary showing that is required to demonstrate that Marti knew Judge Modica was intentionally misled when she issued the warrant. Plaintiffs adduce no evidence to support their claim about what Marti knew, beyond their conclusory claims that the events described in the warrant affidavit did not happen.

Plaintiffs suggest five reasons for why Marti knew the warrant was improperly issued: (1) the pawnshop's books do not document the illegal sales that occurred on April 16 and May 6; (2) the NYPD did not videotape the undercover operation; (3) the plaintiffs assert that they never do anything illegal; (4) Marti allegedly has an animus toward the plaintiffs; and (5) the charges against Cabrera and Ali were dismissed. None is persuasive.

■ The pawnshop's books and records do not support plaintiffs' argument that Marti knew the warrant was improperly issued. Plaintiffs' argument rests on the assumption that their books and records document every transaction that happened in their store. This argument assumes too much. The absence of illegal sale entries in the plaintiffs' logs is consistent with both the description of events in the warrant affidavit and common sense. The warrant affidavit expressly states that the plaintiffs' employee did not record the illegal transaction. Furthermore, common sense dictates that the pawnshop's books and records, which are subject to police inspection, would not document an *illegal* transaction. Thus, in this case, what is *not* in the plaintiffs' books and records does not admit of a legitimate inference that the warrant affidavit is false.

■ Plaintiffs next contend that, if the events described in the affidavit did happen, then the NYPD should have docu-

mented them by videotape. This argument is silly. There is no requirement that a "sting" operation be videotaped before a magistrate may rely on an officer's sworn statement.

■ Next, plaintiffs assert that the illegal sale never occurred because "nobody at 5 BOROUGH PAWN would ever accept a transaction involving collateral which was knowingly stolen—let alone advertised as stolen." (Pl. Opp'n at 8.) This conclusory and entirely self-serving claim is not backed up by any proof. Plaintiffs offer no sworn testimony from the people who were working at the pawnshop on the days that the illegal sales happened that calls the warrant affidavit into question. Indeed, plaintiffs' response to the defendants' Local Rule 56.1 statement reveals that they do not know what happened on April 16 and May 6. For example, in response to paragraph 7 of defendants' Rule 56.1 statement—"On May 6, 2008, Sgt. Raia again returned to the premises and sold additional merchandise to plaintiffs. Plaintiffs never requested the identity of Sgt. Raia" (Def. Rule 56.1 ¶ 7)—plaintiffs state: "Plaintiff does not have information sufficient to form a belief to this statement." (Pl. Rule 56.1 ¶ 7.) If the plaintiffs do not know what happened on May 6, then their assertion that one of their employees never accepted stolen merchandise is insufficient to raise a disputed issue of fact.

■ Plaintiffs also attack the warrant by claiming that Marti had a vendetta against the plaintiffs once they filed this lawsuit. But Marti's state of mind is irrelevant to the validity of the warrant. Nothing in the record connects Marti to the undercover "sting" operation. Sergeant Raia was the officer who, according to Officer Keith Doumas' affidavit, sold the pawnshop stolen goods. The affidavit supporting the application for the warrant was

from Doumas—not Marti. No allegation, and no offer of proof, establishes any nexus between these officers' actions and Marti. Plaintiffs *speculate* that Marti must have caused a false warrant affidavit to be submitted to a judge because he wanted to get back at the plaintiffs for filing this lawsuit. But their conjecture is not an offer of proof; it does not rise to the level of a "substantial preliminary showing."

■ Furthermore, if we limit ourselves to consideration of the issue of qualified immunity, Marti's state of mind is irrelevant because his particular state of mind is *subjective*, while qualified immunity is judged under an *objective* standard. "The fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Simms*, 115 F.3d at 1108 (*quoting Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)); *see also Jones*, 465 F.3d at 64 (noting that subjective intent is irrelevant when evaluating the qualified immunity defense).

■ Finally, plaintiffs argue that probable cause to issue the warrant could not have existed because the charges against Cabrera and Ali were dismissed prior to arraignment. However, the eventual disposition of a criminal charge does not vitiate the existence of probable cause at the time the warrant was issued. *See Reinhart*, 599 F.Supp.2d at 329; *see also, Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ("a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved"). Plaintiffs' are required to offer the court some evidence tending to

show that Marti knew, at the time the warrant was executed, that the statements supporting the warrant were false. They make no such showing.

In short, not one of plaintiffs' attacks on the warrant affidavit—viewed in isolation or together—raises a genuine issue of fact suggesting that Marti knew the warrant affidavit was false when he executed it. Marti's motion for summary judgment on the claims arising out the May 15 search is granted.

### H. Pre-discovery, Marti is not entitled to federal qualified immunity for the Second Arrest.

Cabrera argues that Marti is not entitled to qualified immunity for his Second Arrest,[5] because Marti did not have probable cause to make it. Sergeant Marti argues that, based on the *search warrant*, probable cause existed because he had "every reason to believe that plaintiffs had committed a crime." (Def. Mem. at 12.)

██ Unfortunately, Marti cannot rely on the search warrant to establish probable cause. A search warrant is different from an arrest warrant. A search warrant allows the police to search a location for the objects described in the warrant. It does not, on its own, authorize the police to make an arrest. If an officer makes an arrest while executing a *search* warrant, the officer is making a warrantless arrest.

██ As previously discussed above, a "police officer may arrest an individual without an arrest warrant when he has probable cause to believe that a crime or offense has been committed *by that person in his presence.*" *People v. Castillo,* 106 Misc.2d 949, 436 N.Y.S.2d 699, 700 (N.Y.Crim.Ct.1981) (*citing* N.Y.Crim.

Proc. 140.10 and *People v. DeBour,* 40 N.Y.2d 210, 224, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976)) (emphasis added). Alternatively, the officer may make a warrantless arrest for a crime committed outside his presence when he has probable cause to believe that a crime was committed by that person. N.Y.Crim. Proc. Law § 140.10. Whether Marti is entitled to qualified immunity for the Second Arrest hinges on whether, at the time of the arrest, Marti had "arguable probable cause" to believe that Cabrera and Ali committed a crime outside his presence, i.e., receiving and concealing stolen property. *See also* Part IV.D. *supra.* That is to say, the relevant question is whether there was information that came out of the "sting" operation that gave Marti probable cause to believe that Cabrera or Ali could have been the employee who took the stolen merchandise from Sergeant Raia.

This raises a factual issue that cannot be resolved at the pre-discovery stage.

Plaintiffs allege that, when Marti went to execute the search warrant, he arrested Cabrera and Ali immediately—before the NYPD searched the pawnshop for "stolen" property. (Am. Compl. ¶¶ 112–13.) At that point in time, neither Cabrera nor Ali had committed any crime in Marti's presence. Nothing in the warrant identified either of them by name or by description as having committed a crime in the past.

Marti urges that, simply by reading the search warrant, an officer could have arguable probable cause to believe Cabrera and Ali should have been arrested. Marti's reliance on what is in the search warrant is misplaced. The search warrant only describes the items to be seized. It does not give reason to believe that Cabrera or Ali

---

**5.** Ali is not a party. Only Cabrera has the right to assert a claim for false arrest and for

constitutional violations stemming therefrom.

were committing a crime at the time of the search or that either of them personally committed any crime in the past. The warrant provides:

TO ANY POLICE OFFICER OF THE NEW YORK CITY POLICE DEPART-MENT

Proof by affidavit having been made this day before me by Police Officer Keith Doumas, Shield No. 21013 of the 102 Precinct, that there is reasonable cause to believe that certain property, to wit: four gold rings, two plain wedding bands of a man's size, another ring had engraved parallel lines with small asterisk-like stars between the lines, a gold ring with three small diamonds and with a small straight line was scratched onto that part of the ring which would rest upon the palm of the hand, a nameplate reading "Robert Mary" with two harts between the names, a gold medallion with a Jesus portrayed with a shepherd's crook and two lambs. The rear of this large medallion (approximately 5 inches in its largest dimension) has a small "D" scratched onto it, the touchstone, vials of acids, scales, and records of purchases on computers and contents of safes, the touchstone, vials of acids, scales, and records of purchases on computers and contents of safes [text repeated in original] will be found inside 5 Borough Pawn, a storefront pawnbroker at 93–45a 104 Street, Queens, NY, the name is on sign above the store. The store is on the corner and next to a pizzeria which is unlawfully possessed or has been used, or is possessed for the purpose of being used, to commit or conceal the commission of an offense or constitutes evidence or tends to demonstrate that an offense was committed in violation of Articles 165 and 175 of the Penal Law of the State of New York.

YOU ARE THEREFORE COMMANDED between 6:00 a.m. and 9 p.m. to make a search of 5 Borough Pawn, a storefront pawnbroker at 93–45a 104 Street, Queens, N.Y. for the above property and the computer for forensic examination

AND, if you find such property and/or evidence, or any part therefore, to bring it and this warrant before this or another Court without unnecessary delay.

(Gertzer Decl. Ex. C.) Cabrera and Ali are not mentioned by name in the warrant.

Indeed, the warrant identifies no one, let alone suggest that the people working at the pawnshop at the time of the search had committed any crime. The only information that a police officer could gather from reading the search warrant is that evidence of a crime is to be found at 5 Borough Pawn. That information, without more, does not provide an officer with probable cause to make a warrantless arrest of some particular person before executing the search. *See People v. Bigelow,* 66 N.Y.2d 417, 424, 497 N.Y.S.2d 630, 488 N.E.2d 451 (1985).

At this stage of the lawsuit, Marti cannot rely on the warrant affidavit to establish that he had probable cause to make the arrests. The warrant affidavit does not identify anyone (including Cabrera or Ali, the people who were arrested) by name. It does provide a physical description of the 5 Borough Pawn employee who accepted stolen merchandise from Sergeant Raia on the three occasions she went to 5 Borough Pawn. That employee is a "male, Hispanic, 6'0", 165 lbs., 30–35yrs., heavy build." (Gertzer Decl. Ex. D ¶ 4.) However, there is nothing in the record establishing that either Cabrera (who is a party to the lawsuit) or Ali (who is not) looks like the person described in Doumas' affidavit.

Of course, plaintiffs' story might be wrong; the record may eventually be such

that Marti will be entitled to qualified immunity for this arrest. If Marti testifies that he read the search warrant affidavit, and that Cabrera met the description of the employee who took the "purloined" merchandise from Sergeant Raia, then perhaps Marti would have arguable probable cause to arrest Cabrera the moment he walked into the store. Alternatively, Marti might not have arrested Cabrera or Ali before the search of the safe, as Cabrera contends; he might have made the arrest after the search turned up evidence of stolen property in the safe. Until the record is fleshed out, any such determination is premature—and at this moment the Court is accepting plaintiffs' pleading as true.

Accordingly, based on plaintiffs' version of the events arising out of the Second Arrest, Marti's motion for summary judgment on the basis of qualified immunity is denied. It is, however, denied without prejudice; Marti may renew the motion after discovery.

## I. Plaintiffs' state law claims against Marti.

Plaintiffs bring six state law causes of action against Marti arising out of the May 15 search of 5 Borough Pawn and Cabrera's arrest. Plaintiffs' claims for conversion and interference with a business are based on Marti's search of the pawnshop. The remaining state law claims—unlawful arrest, assault, intentional infliction of emotional distress and malicious prosecution—focus on Marti's arrest of Cabrera.

The resolution of these state law causes of action corresponds with this Court's determination of the reasonableness of the May 15 search and arrest. As already discussed, Marti's search of 5 Borough Pawn was objectively reasonable. Therefore, Marti cannot be held liable for any state law claims arising out of the search.

Plaintiffs' conversion and interference with a business claims against Marti are dismissed.

The remaining state law claims, which arise out of the arrest, are a different story. At this juncture, there are unresolved issues about whether it was reasonable for Marti to arrest Cabrera, because the circumstances of the arrest are disputed. Accordingly, the Court cannot determine whether to grant Marti's motion for qualified immunity. Marti may renew his motion on these state law claims after discovery.

## VII. Plaintiffs' claims against Commissioner Kelly are dismissed.

### A. Federal law claims

To prevail on a claim under § 1983 for a violation of his constitutional rights, a plaintiff must establish that the defendant was personally involved in the constitutional violation. *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997). A plaintiff may establish a supervisor's personal involvement in a constitutional violation by showing:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995) (internal quotation and citation

omitted). However, "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior* .... In a § 1983 suit ... masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his ... own misconduct." *Iqbal, supra,* 556 U.S at ——, 129 S.Ct. at 1948–49; *see also Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Simmons v. Kelly,* 06 Civ. 6183, 2009 WL 857410, at *3 (S.D.N.Y. Mar. 31, 2009).

The plaintiffs argue that Commissioner Kelly is personally liable for the actions of his subordinates under a theory of *respondeat superior* or supervisory liability. That theory of liability plainly fails as a matter of law. *See Iqbal, supra,* 556 U.S. at ——, 129 S.Ct. at 1948–49 (discussing same).

■ Plaintiffs also claim that Kelly was deliberately indifferent to the unconstitutional policies, i.e., the searches and arrests conducted pursuant to Section 436, carried out by Marti. To establish a claim of deliberate indifference, plaintiffs rely on the existence of the Grasso memo, which they contend represents the official policy of the NYPD. Plaintiffs argue that Marti's actions were contrary to the Grasso memo, and that his alleged unconstitutional conduct only can be explained in two ways: (1) Marti willfully ignored the memo; or (2) Marti did not properly follow the memo because of Kelly's deliberate indifference. The entirety of plaintiffs' allegation is Kelly "encouraged and permitted such unconstitutional policies and customs to be carried out and [has] thereby demonstrated a deliberate indifference to those constitutional values and otherwise [has] knowingly acquiesced in the end actions." (Am. Compl. ¶ 34.) In other words, plaintiffs discount entirely the very real possibility that Marti might have ignored the Grasso memo.

■ Plaintiffs' argument is wholly unpersuasive. Pursuant to § 1983, a supervisor may be found *personally* liable for his deliberate indifference to the rights of others only when he has failed "to act on information indicating unconstitutional acts were occurring." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). This requires plaintiffs to plead that Kelly had notice of some constitutional violation and failed to act. *See Ziemba v. Armstrong,* 430 F.3d 623, 625 (2d Cir.2005) (per curiam). Plaintiffs do not plead any facts that would admit of such an inference; the do not plead either that Kelly knew Marti was violating people's constitutional rights or that Kelly was aware that large numbers of officers were doing so. Furthermore, by ignoring the Grasso memo, Marti was not violating anyone's *federal* constitutional rights. So no § 1983 claim for deliberate indifference lies in any event.

■ It is obvious that the only reason Kelly is a named defendant in this lawsuit is because he is the Police Commissioner. In other words, plaintiffs are really suing Kelly in his official capacity. But that renders their claims against Kelly duplicative of their claims against the City. *See Goldberg v. Town of Rocky Hill,* 973 F.2d 70, 73 (2d Cir.1992) (*citing Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "A suit for damages against a municipal officer in their official capacity is the equivalent of a damage suit against the municipality itself." *Escobar v. City of New York,* 05 Civ. 3030, 2007 WL 1827414, at *3 (E.D.N.Y. June 25, 2007) (*citing Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)); *see also Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (holding that a suit against a

person in his official capacity is to be treated as a suit against the entity).

Accordingly, the § 1983 claims against Kelly are dismissed.

## B. State law claims

Plaintiffs bring state law causes of action against Kelly for (1) intentional interference with a business, and (2) emotional distress.[6] Kelly, like Marti, argues that New York's version of qualified immunity protects him from being sued on such state law claims.

 Plaintiffs fail to respond to Kelly's point. Furthermore, neither plaintiffs' complaint nor their opposition to this motion contains any non-conclusory allegation suggesting that Kelly ever did anything except continue the Grasso memorandum in force—which accurately reflects state constitutional law—let alone that he even took any action affecting plaintiffs in bad faith.

Accordingly, Kelly is entitled to state law qualified immunity on plaintiffs' state law claims, and they are dismissed.

## VIII. The Defendants' Motion to Dismiss Plaintiffs' *Monell* Claim is granted because there is no federal constitutional violation.

 A municipality can be held liable under 42 U.S.C. § 1983 where a policy, custom or practice caused the deprivation of the plaintiffs' constitutional rights. *See Monell,* 436 U.S. at 690, 98 S.Ct. 2018. But "unlike various government officials, municipalities do not enjoy immunity from

suit—either absolute or qualified—under § 1983." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Plaintiffs must demonstrate "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Plaintiffs must show that the municipal policy was the "moving force [behind] the constitutional violation." *Id.* at 389, 109 S.Ct. 1197 (*quoting Monell,* 436 U.S. at 694, 98 S.Ct. 2018 and *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)). "Though this does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation, ... a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy .... The inference that a policy existed may, however, be drawn from circumstantial proof ...." *Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991). "In short, a municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury." *Leatherman,* 507 U.S. at 166, 113 S.Ct. 1160.

Plaintiffs contend that defendants' motion for summary judgment on their *Monell* claim is premature because they have not yet had discovery about whether an unconstitutional policy or custom exists. They argue that Sergeant Marti's comment about why he had the authority to

---

**6.** Plaintiffs' allegations against Kelly are anything but clear. In describing their claims, plaintiffs refer to "defendants'" actions without identifying a specific defendant who took action. However, on many occasions, it is apparent that plaintiffs only allege one defendant, Marti, violated their rights. For example, plaintiffs' second cause of action for false

imprisonment is only against Marti, because plaintiffs use the singular "defendant" and identify Marti as the actor who intentionally confined Cabrera. Although plaintiffs' complaint is poorly pled, the parties seem to agree that all of plaintiffs' claims against Kelly arise out of the First Arrest.

search the pawnshop's safe—"we don't require any warrants ... the New York City Charter § 436[ ] allows us to do this"—is evidence of an undisclosed municipal policy.

The defendants argue that the existence of the Grasso memo shows that the City has a policy to enforce Section 436 so that it complies with both the U.S. Constitution and state constitution. Defendants contend the plaintiffs' Monell claim collapses onto itself, because plaintiffs' fail to identify an unconstitutional policy under federal law.

■ Defendants are correct. The only municipal policy that plaintiffs identify comes from the Grasso memo. The Grasso memo reflects the City's policy to conform Section 436 searches to New York's Constitution, which necessarily conforms the policy to the Federal Constitution, because New York's Constitution provides broader protections against warrantless administrative searches. Therefore, the existence of the Grasso memo does not show that the City has a federal unconstitutional policy.

There are no plausible factual allegations in plaintiffs' complaint to suggest otherwise. After the Supreme Court's recent decision in *Iqbal*, 556 U.S. ——, 129 S.Ct. 1937, there is no possibility that the plaintiffs' pleading on this point entitles them to discovery. In *Iqbal*, 556 U.S. ——, 129 S.Ct. 1937, the Supreme Court held that the plaintiff, Iqbal, failed to state a claim for purposeful and unlawful discrimination. In so doing, the Court held that the previously announced pleading standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), "expounded the pleading standard 'in all civil actions and proceedings in the United States district courts.'" *Iqbal*, 556 U.S. at ——, 129 S.Ct. at 1953.

Iqbal brought a *Bivens* action against former Attorney General of the United States, John Ashcroft and Director of the Federal Bureau of Investigation, Robert Mueller. He alleged that defendants knowingly "subjected him to harsh conditions of confinement as a matter of policy, solely on account of his religion, race, and/or national origin ... [and that] Ashcroft was the principal architect of this invidious policy." *Id.* at 1951 (internal quotations and punctuation omitted). The Court held that plaintiffs' "bare assertions" amounted to "nothing more than a formulaic recitation of the elements" of plaintiffs' claim. *Id.* As such, the Court dismissed plaintiff's claim, because he failed to plead enough factual content to "nudge his claim ... across the line from conceivable to plausible." *Id.* at 1952 (*quoting Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.).

Similarly, plaintiffs' pleading in this case "does not unlock the doors of discovery," *id.* at 1950, because their assertion that the City has an unconstitutional policy is based on nothing more than their unsupported supposition. The record reveals that the City has a policy, per the Grasso memo, to conduct Section 436 inspections in a state and federally constitutionally compliant manner. Indeed, the record show that the NYPD changed its 436 inspection policy, via the Grasso memo, so that the inspections would not be subject to state (and federal) constitutional challenges.

As discussed above, Marti clearly violated that policy. However, there are no plausible factual allegations in the complaint tending to suggest that Marti's actions could be attributed to an unspoken municipal policy that is different from the one reflected in the Grasso memo. For example, plaintiffs do not identify any oth-

er officers who behaved similarly to Marti. The plausible explanation for Marti's actions is that he was a rogue officer who disobeyed City policy.

Furthermore, plaintiffs' pleading is woefully inadequate, because alleging that the NYPD does not follow the Grasso memo does not plausibly suggest that there is a federal constitutional violation. The Grasso memo was issued so that an officer's conduct would comply with New York's broader state constitutional protections. It is possible that an officer could ignore the Grasso memo, violate state constitutional law, and still not violate federal constitutional law. The plaintiffs fail to allege any facts showing that there is a City policy—unspoken or otherwise—that violates the Federal Constitution.

Accordingly, the City's motion to dismiss the *Monell* claim is granted.

### IX. Plaintiffs' Cross–Motion for Discovery is Denied

In opposing defendants' motion for summary judgment, plaintiffs' cross-moved for discovery, pursuant to Federal Rule of Civil Procedure 26. Discovery in this case was stayed pending resolution of defendants' motion for summary judgment based on qualified immunity. Since some of plaintiffs' claims have not been dismissed, that stay is now lifted, so plaintiffs' cross-motion is denied as moot.

The parties are directed to appear before this Court at 11:30 AM on July 9, 2009, in Courtroom 14C to discuss a discovery schedule.

### Conclusion

For the reasons stated above, defendants' motion for summary judgment is granted in part and denied in part. (*See* Docket No. 20.) Plaintiffs' cross-motion for discovery is denied as moot. (*See* Docket No. 33.)

This constitutes the order of this Court.