5 BOROUGH PAWN, LLC., Ruben D. Cabrera, Rebecca Cabrera and Brian Cabrera, Plaintiffs,

v.

Sergeant Ron MARTI, Defendant.

No. 08 cv 3837(CM).

United States District Court, S.D. New York.

Oct. 22, 2010.

---

188

Paul Joseph Solda, Law Office of Paul Joseph Solda, New York, NY, for Plaintiffs.

Michael Keith Gertzer, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendant.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

For the second time, this case comes before the Court on a motion for summary judgment. In *5 Borough Pawn, LLC v. City of New York*, 640 F.Supp.2d 268 (S.D.N.Y.2009) (*"5 Borough I"*), this Court granted in part and denied in part Defendants' pre-discovery motion for summary judgment. The Court also granted Defendants the right to renew their motion as to Plaintiffs' surviving claims following discovery.

Discovery is now complete and the only remaining defendant, Sergeant Ron Marti, brings this renewed motion for summary judgment. For the reasons set forth below, Marti's motion is granted in part and denied in part, and Plaintiffs' cross motion for summary judgment and for a protective order is denied.

### BACKGROUND

This litigation stems from the tumultuous relationship between the owner of a Queens pawnshop ("5 Borough") and a NYPD Sergeant at the 102nd precinct. Much of the relevant background information was detailed in *5 Borough I* and will not be repeated here. *See 5 Borough I, supra*, 640 F.Supp.2d at 281–84. In short, Plaintiff Brian Cabrera[1] alleges that Sgt. Marti wrongfully arrested him twice: once on January 23, 2008 ("First Arrest") for refusing to consent to an unlawful search of his business; and again on May 15, 2008 ("Second Arrest"), while Marti and several other officers executed a search warrant of the premises. The following claims against Marti survived summary judgment in *5 Borough I*: (1) federal and state false arrest and false imprisonment claims stemming from both arrests; (2) federal and state claims for malicious prosecution for both arrests; and (3) state claims for assault and intentional infliction of emotional distress ("IIED"). Plaintiffs Ruben Cabrera and Rebecca Cabrera—Cabrera's parents and minority owners of the pawnshop—also assert IIED claims against Marti.

Sgt. Marti denies that either arrest was unlawful. He claims that the First Arrest was lawful because Cabrera violated New York City Charter § 436[2] by refusing to consent to an "administrative search" of the premises; and the Second Arrest was lawful because Sgt. Marti had probable cause to arrest Cabrera for knowingly receiving stolen goods. In the alternative, Marti argues that he is protected from suit by federal and state qualified immunity because even if the arrests were unlawful, a reasonable officer in Marti's position could have concluded that they were lawful.

Genuine issues of fact preclude granting the motion, even now, after the close of discovery. However, Marti's motion for summary judgment dismissing several of plaintiff's other claims is granted.

---

1. The Court refers to plaintiff Brian Cabrera as "Cabrera" throughout this opinion. Plaintiffs Ruben Cabrera and Rebecca Cabrera are referred to by both their first and last names.

2. Section 436 provides in part: "The commissioner shall possess powers of general supervision and inspection over all licensed or unlicensed pawnbrokers ... and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession." As discussed below, NYPD policy limits the scope of permissible inspections pursuant to § 436 to comply with court-recognized state constitutional limitations.

## PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on April 23, 2008. That complaint was limited to claims arising out of the First Arrest. The case was then placed on the court's suspense calendar, pending the resolution of criminal charges against Cabrera.[3] The case was removed from the suspense calendar on September 11, 2008.

At an initial pre-trial conference on October 17, 2008, the Court granted Plaintiffs permission to amend their complaint to incorporate claims arising from the Second Arrest. An amended complaint was filed on October 27, 2008. The amended complaint asserted claims against the City of New York, the New York Police Department, NYPD Commissioner Raymond Kelly, and Sgt. Marti. On November 26, 2008, all defendants moved for summary judgment in lieu of an answer. In *5 Borough I*, decided June 22, 2009, the claims against all defendants other than Sgt. Marti were dismissed.

The parties subsequently conducted discovery on Plaintiffs' remaining claims, and Sgt. Marti filed his second motion for summary judgment on March 2, 2010. On April 9, 2010, Plaintiffs' filed a cross motion for summary judgment and for a protective order.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## DISCUSSION

### I. Cabrera's Claims for False Arrest and False Imprisonment

### A. Applicable Legal Standards

#### (1) Federal Standard for Qualified Immunity

█ Government officials performing discretionary functions are entitled to qualified immunity "from federal constitutional claims ... as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The inquiry has two steps, and under the old rule in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the steps had to be addressed in a particular order. *See Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009) (discussing old approach). First, a court had to determine whether, taking the facts in the light most favorable to the party asserting the injury, a constitutional infraction had been committed. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. If the answer to that question was yes, then, and only then, could a court proceed to the second step, requiring a court to decide whether a reasonable official in defendant's position (as that position is described by plaintiff) ought to have known that he was violating plaintiff's federal constitutional rights by doing what plaintiff alleges he did. *Id.* at 201–02, 121

---

3. Those charges were ultimately dropped.

S.Ct. 2151. Ordinarily, under this last step, the relevant inquiry will be whether the law is in fact well-settled—because if it is, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Claims that a public officer made a reasonable mistake of fact, "go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity." *Stephenson*, 332 F.3d at 78 (*citing Saucier*, 533 U.S. at 205–06, 121 S.Ct. 2151).

The Supreme Court's recent decision on qualified immunity, *Pearson*, 129 S.Ct. 808, finally recognized what lower courts applying the doctrine have known for years—that in many cases, the procedure outlined in *Saucier* was convoluted and unworkable. The Court held, "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. This is because, "[t]here are circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking." *Pearson*, 129 S.Ct. at 820. For example, when a court may easily decide that the alleged violation of the constitutional right was not clearly established, there is no need to reach the constitutional question. *Id.* Likewise, "[a] constitutional decision resting on an uncertain interpretation of state law is also of doubtful precedential importance," *id.* at 819, because such a decision depends on a "federal court's uncertain assumptions about state law." *Id.* (internal quotation and citation omitted).

Although *Pearson* frees a court from *Saucier*'s "rigid order of battle," a court is still free "to make a 'threshold inquiry' as to the violation of a constitutional right." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir.2009). That constitutional inquiry is appropriate when "discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Id.* (*quoting Pearson*, 129 S.Ct. at 818.)

One thing is clear: if there was no actual constitutional violation, qualified immunity is not implicated. When a material issue of fact precludes the court from determining whether a constitutional violation occurred as a matter of law, a jury must first resolve that issue. Then, and only then, will the court pass on the question of whether the defendant is nonetheless shielded from suit by qualified immunity. *See Stephenson v. Doe*, 332 F.3d 68, 80 (2d Cir.2003) ("If the jury returns a verdict of excessive force against defendant, the court should then decide the issue of qualified immunity.").

### (2) New York's Version of Qualified Immunity

■■■ The doctrine of qualified immunity is generally understood to only protect government officials from federal, not state, causes of action. *Jenkins v. City of New York*, 478 F.3d 76, 86 (2d Cir.2007). New York common law, however, fills this gap by providing government officials with a similar form of protection against state law claims. *Id.*; *see Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir.2006). "New York law ... grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones*, 465 F.3d at 63 (*citing Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir.2004), and *Arteaga v. State*, 72

N.Y.2d 212, 216–17, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988)). "To be entitled to qualified immunity, it must be established that it was objectively reasonable for the police officers involved to believe that their conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether their conduct was proper." *Allen v. City of New York,* 03 Civ. 2829, 2007 WL 24796, at \*24 (S.D.N.Y. Jan. 3, 2007) (internal citations and quotations omitted). Thus, as is true of federal law, an officer's entitlement to qualified immunity under New York law depends on the reasonableness of his ultimately illegal actions. *Jones,* 465 F.3d at 64 (citing cases). However, the reasonableness of an officer's action is judged with references to state law and the state, not the federal, constitution. *Allen,* 2007 WL 24796, at \*24 (*citing Doyle v. Rondout Valley Cent. Sch. Dist.,* 3 A.D.3d 669, 670–71, 770 N.Y.S.2d 480 (N.Y.App.Div.2004)).

Again, there is no reason for an officer to invoke the protection of qualified immunity if his actions did not violate state law and the state constitution, because if he did nothing wrong, he needs no immunity to shield him.

### (3) False Arrest and False Imprisonment

■ In analyzing § 1983 claims for unconstitutional false arrest and imprisonment, federal courts look to the law of the state in which the arrest occurred—not federal law. *See Davis v. Rodriguez,* 364 F.3d 424, 433 (2d Cir.2004); *Washpon v. Parr,* 561 F.Supp.2d 394, 402 (S.D.N.Y. 2008). Under New York law, "a plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *see also Covington v. City of New York,* 171 F.3d 117, 122 (2d Cir.1999) (noting that a § 1983 claim for

false arrest based on the Fourth Amendment is substantially the same for false arrest under New York law). "Under New York law, the elements of a false imprisonment claim are: (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Weyant,* 101 F.3d at 853 (internal quotations and citations omitted, brackets in the original). The existence of probable cause to arrest is a complete defense. *See Covington,* 171 F.3d at 122; *Jones v. J.C. Penny's Dep't Stores Inc.,* 317 Fed.Appx. 71, 73–74 (2d Cir.2009). Probable cause is determined at the time of the arrest. *Reinhart v. City of Schenectady Police Dep't,* 599 F.Supp.2d 323, 328 (N.D.N.Y.2009) (*citing Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)).

■ In addition, "Even if there was no probable cause to arrest, a police officer may nonetheless be immune from a claim of false arrest under the doctrine of qualified immunity if 'either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Washpon,* 561 F.Supp.2d at 403 (*quoting Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)); *see also Lee v. Sandberg,* 136 F.3d 94, 102–03 (2d Cir. 1997) (applying same to false imprisonment claim). Courts call this additional test for qualified immunity "arguable probable cause"—which, as it sounds, "is more favorable to officers than the one for probable cause." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004).

In New York, a police officer has probable cause to make an arrest for:

(a) Any offense when he has reasonable cause to believe that such person has

committed such offense in his presence; and

(b) A crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise.

N.Y.Crim. Proc. Law § 140.10(1). If officers of reasonable competence could disagree about the existence of reasonable cause to arrest, the officer is entitled to qualified immunity.

**B. *Sgt. Marti is Not Entitled to Federal or State Qualified Immunity for the First Arrest***

■ The critical question with regard to Cabrera's false arrest and false imprisonment claims is whether Sgt. Marti had either actual or arguable probable cause to arrest Cabrera on January 23, 2008. If he did, Marti is entitled to summary judgment—either because he did nothing wrong in the first place (i.e., the arrest was actually lawful) or because he is protected by qualified immunity (if the arrest was actually unlawful but it was objectively reasonable for an officer in his situation to believe that it was lawful). Conversely, if Marti arrested Cabrera without at least "arguable probable cause," he is not shielded by qualified immunity, because his actions were objectively unreasonable.

With respect to the First Arrest, whether Sgt. Marti had probable cause to arrest Cabrera depends on the answer to a second question—whether Sgt. Marti demanded free access to 5 Borough's restricted areas and safe (as Plaintiffs allege), or merely requested an on-site inspection of the pawnshop's books (as Marti contends) on January 23, 2008. If the latter, Sgt. Marti had probable cause to arrest Cabrera; if the former, he did not, and it would not be objectively reasonable for any officer to think that he did.

This issue has already been resolved against Marti, and is law of the case. As this Court explained in *5 Borough I:*

[U]nder state law, there was no probable cause—or even arguable probable cause—*to arrest Cabrera for denying the police access to the safe.* Rather, under state constitutional law, implemented by NYPD policy, Marti was expressly barred from arresting Cabrera for keeping him out of the safe in the absence of a warrant.

640 F.Supp.2d at 288–89 (emphasis added). Because a material issue of fact existed as to whether Sgt. Marti demanded access to Cabrera's safe, the Court concluded that Sgt. Marti was not entitled to summary judgment on his pre-discovery motion. *Id.* at 290. The genuine issue of fact still exists: Cabrera and Marti still tell different stories. Therefore, Marti is not entitled to summary judgment dismissing the false arrest and false imprisonment claims arising out of the first arrest—either because the arrests were lawful or because no reasonable officer could think that an arrest carried out in violation of an express rule promulgated by the NYPD was lawful.

*(1) Plaintiffs' Sworn Affidavits and Deposition Testimony*

All three plaintiffs have been deposed by Defendant, and all three have submitted sworn affidavits that discuss the events of January 23, 2008. Cabrera asserts in his affidavit that he has always complied with law enforcement requests to examine the pawnshop's books. (Aff. of Brian Cabrera in Opp. & in Sup. of Cross Mot. ("Cabrera Aff.") ¶ 2.) Cabrera claims that Sgt. Marti came to 5 Borough on January 23, 2008, and demanded that Cabrera "submit the business to [a] wide open search[ ]," including an examination of the pawnshop's secured area and the contents of its safe.

(*Id.*) At his deposition, Cabrera recounted having the following exchange with Sgt. Marti immediately preceding his arrest:

I said, "Sergeant Marti, can I help you with something? Is there something you need to see?" ... He continued one more time to say, "Open the door, Brian. I am coming in. I want you to open your safe. I want to check your merchandise. I want to check you. I want to check your computers. I want to check your parents." And I [said], "Officer, if that paper is a warrant, can I see it? Give me a chance and I will contact my lawyer." He stated, "You can call your lawyer when you get down to Central Booking. I am now placing you under arrest."

(Brian Cabrera Dep., 45:13–46:7.)

Cabrera's account of the events was corroborated by the deposition testimony of Ruben Cabrera. In discussing the events of January 23, Ruben Cabrera stated that Sgt. Marti said to Cabrera, "I want to look at your safe. I want to look at your books. I want to look at your computer." (Ruben Cabrera Dep., 43:1–2.) When Cabrera refused, he was placed under arrest. (*Id.* at 45:10–46:1.)

Sgt. Marti asserts that the deposition testimony of Rebecca Cabrera contradicts the accounts of Brian Cabrera and Ruben Cabrera as to the events of January 23. Specifically, Marti points to the following exchange between Rebecca Cabrera and Defendant's counsel:

Q. *What happened when the police officers arrived [on January 23]?*

A. Well, they came in. They demand to look at our books. They wanted to go in the back, search the safe. "I could arrest you." My husband was there. "Your mother, father, any employees." you know.

Q. *What specifically did he ask to look at?*

A. He wanted to look at the books. He wanted to go into the safe, look in the safe. I said, "Do you have a warrant?"

Q. *Did you provide the books and records for him to look at?*

A. I don't think so. I think that was why it was noncompliance. They arrested my son for noncompliance, Section 436. He wanted to take it off the premises."

(Rebecca Cabrera Dep., 24:21–25:10.) Defendant claims that this exchange constitutes an "admission" that Sgt. Marti arrested Cabrera for failing to let officers view the pawnshop's books, not for refusing to allow access to the safe and other restricted areas. But it is not an admission at all, since it does not come from the mouth of Cabrera himself. It may create a contradiction for the jury to resolve (or it may not)—but it does not negate the fact that Cabrera's and Ruben's testimony describes a materially different view of events than Marti's testimony does, and so creates a genuine issue of material fact for resolution at trial.

### (2) Defendant's Deposition Testimony

Plaintiffs' deposed Sgt. Marti and several of his colleagues. Not surprisingly, Marti's account of the events leading up to the First Arrest differs significantly from Plaintiffs'.

According to Sgt. Marti, the 102nd precinct conducts biweekly inspections of local pawnshops pursuant to New York City Charter § 436. (Ronald Marti Dep., 69:6–20.) During these inspections, the pawnshop is asked to provide a printout of certain records, and the police officer conducting the inspection takes those records back to the precinct. (*Id.* at 65:8–14; 87:22–88:7.)

At some point prior to January 23, 2008, Sgt. Marti became aware that 5 Borough was not consenting to his officers' "administrative checks of [5 Borough's] logs and records." (*Id.* at 91:12–18.) Sgt. Marti then personally visited 5 Borough "several times" prior to January 23, but he was likewise unable to persuade 5 Borough to turn over its records. (*Id.* at 94:11–96:15.) When Cabrera refused to comply once again on January 23, Marti arrested him for noncompliance with § 436. (*Id.* at 102:17–103:10.)

According to Sgt. Marti, at no time on January 23 did he request access to 5 Borough's safe. (*Id.* at 120:12–15.) Sgt. Marti further testified that 5 Borough became "compliant" in February 2008 when Cabrera finally consented to an "administrative check." (*Id.* at 125:2–127:12.)

While Sgt. Marti testified that 5 Borough failed to comply with records requests on several occasions, he could not produce any documentation of 5 Borough's noncompliance. According to Marti, a form is filled out following each pawnshop inspection, but those forms are "usually [left] on the desk and after a while they just get thrown out." (*Id.* at 129:14–15.)

### (3) Discussion

Sgt. Marti makes much of the fact that Rebecca Cabrera "admitted" that Marti requested to view 5 Borough's books along with the contents of the pawnshop's safe. (Def. Br., 10–11.) In light of Rebecca Cabrera's testimony, Marti argues that he had probable cause to arrest Cabrera for failing to consent to a search of the books, *even if* Marti contemporaneously requested access to the safe. This argument fails.

As discussed in *5 Borough I*, the NYPD issued a memo, known as the Grasso Memo, in 1999 delineating the procedures law enforcement officers must follow when conducting administrative searches under § 436 in light of court-recognized constitutional limitations. The Grasso Memo authorizes officers to "inspect the books and records" of pawnshops, but requires them to obtain a search warrant before conducting a search for the purpose of finding evidence of criminal activity. 640 F.Supp.2d at 280. The memo further directs officers to "issue a Universal Summons returnable to Criminal Court" in the event that a pawnshop operator refuses to consent to an administrative search. *Id.* at 280–81.

It is clear from the Grasso Memo that an officer would violate NYPD policy by demanding access to a pawnshop's safe or restricted areas as part of an administrative search. As the Court noted in *5 Borough I:*

> The New York Court of Appeals' decision in [*People v. Scott,* 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328 (N.Y. 1992)] and the Grasso Memo—which was official NYPD policy—make it perfectly clear that police officers are not privileged, under the New York State Constitution, to invade safes without a warrant. . . . *The Grasso memo is quite clear—an officer is not allowed to make an arrest in such a situation.* The memo authorizes an officer to issue a citation, secure the premises, and obtain a warrant if he has probable cause to believe that the safe contains stolen property. Marti did none of these things. Instead, he made an arrest—the one thing he was explicitly not allowed to do.

640 F.Supp.2d at 290. Thus, this Court concluded that Sgt. Marti lacked probable cause or even arguable probable cause to arrest Cabrera for refusing to grant Marti access to 5 Borough's safe. That conclusion has not changed since the *5 Borough I* decision came down.

To the extent that Rebecca's testimony contradicts that of Brian and Ruben, it is for the jury to resolve that conflict. Furthermore, if Marti simultaneously ordered Cabrera to consent to a lawful search (of the books and records) and an unlawful search (of the contents of the safe)—which is how Marti read Rebecca's testimony—and Cabrera refused to consent to either, it is up to the trier of fact which refusal caused Cabrera to be arrested. That determination cannot be made by the Court as a matter of law.

In any event, the Court is not convinced that Rebecca Cabrera's deposition testimony, *read in the light most favorable to Plaintiffs,* indicates that Sgt. Marti asked to review the pawnshop's books in a manner permissible under § 436. A factfinder could reasonably infer from Rebecca Cabrera's testimony that Sgt. Marti demanded to seize the books and take them back to the precinct. The Grasso Memo permits an officer to "visit [a] pawnbroker ... during regular business hours ... request to inspect required books and records ... [and] review required records for accuracy and completeness." A factfinder could reasonably conclude that Rebecca Cabrera's testimony evinces Sgt. Marti's intent not to *inspect* the books and records, but rather to *seize* them, which Sgt. Marti did not have the authority to do under the Grasso Memo.

The Court further notes that the Grasso Memo instructs officers to issue a "Universal Summons returnable to Criminal Court" in the event that a pawnshop does not comply with an administrative search. Sgt. Marti has not alleged that he ever served Cabrera with a summons, despite the fact that Cabrera repeatedly refused to consent to § 436 searches. Marti's failure to issue a summons before arresting Cabrera for noncompliance with § 436 could lead a factfinder to reach the perfectly

reasonable conclusion that Marti's justification for arresting Cabrera was merely pretext, and that he was actually arrested for failing to consent to an unlawful search of the pawnshop's safe.

In short, numerous genuine issues of material fact exist concerning whether Sgt. Marti had probable cause to arrest Cabrera on January 23. Because it would not be possible for reasonable officers to believe that they had probable cause to arrest under the circumstances testified to by Plaintiffs (the only view of the evidence that matters for qualified immunity purposes), Marti is not entitled to summary judgment dismissing the false arrest and false imprisonment claims relating to the First Arrest under either federal or state law. This case must go to trial.

### C. Sgt. Marti is Not Entitled to Federal or State Qualified Immunity for the Second Arrest

#### (1) Background

According to Sgt. Marti, after Cabrera consented to a § 436 search in February 2008, Cabrera subsequently refused to comply with several additional requests in the following months. (Ronald Marti Dep., 126:21–128:7.) Rather than arresting Cabrera again for noncompliance, Sgt. Marti and his colleagues decided to "take a different route." (Ronald Marti Dep., 131:25–132:4.) The "new route" involved a "reverse sting" operation orchestrated by an intelligence officer and a confidential informant ("the CI"). (*Id.* at 132:12–13.) The CI was a regular customer of the pawnshop who allegedly informed the NYPD that the pawnshop regularly and knowingly purchased stolen goods. (*Id.* at 141:20–142:10.)

The first step of the "reverse sting" operation occurred on April 16, 2008. Sergeant Danielle Raia went to 5 Borough, dressed in street clothes, and allegedly

offered several pieces of purportedly stolen jewelry for sale. According to Raia, the jewelry was purchased by an individual matching the description of 5 Borough employee Ryan Ali. (Decl. of Michael K. Gertzer ("Gertzer Decl."), Ex. H.) Raia went back later that same day and sold another item. Again, the employee matching the description of Ali purchased the jewelry, despite Raia's comments indicating that the jewelry had been stolen. (*Id.*)

The two transactions between Raia and Ali were not captured on audio or video recording devices, and Marti has not produced receipts or other physical evidence proving that the transactions took place. However, Raia filed an "Investigative Report" describing the two sales, and she "vouchered" $300 to the NYPD property department, the amount she purportedly received for the jewelry. (*Id.*)

Plaintiffs testified that Raia never visited 5 Borough on April 16, and they maintain that the pawnshop has never knowingly purchased or pawned stolen goods. (*See, e.g.,* Aff. of Brian Cabrera, ¶ 8.)

On May 6, 2008, the CI went to 5 Borough to sell another purportedly stolen piece of jewelry. This time, the transaction was captured by an audio recording device. Marti has produced a transcript of the audio recording. (Gertzer Decl., Ex. I.) The transcript seems to indicate that the CI entered 5 Borough and offered to sell stolen merchandise, and the CI and a 5 Borough employee appear to negotiate a price. It is not clear from the transcript whether a transaction was actually consummated, but Sgt. Marti claims that the stolen goods were, in fact, purchased by the pawnshop. (*Id.*) Marti has provided no physical evidence proving that a transaction occurred, other than documentation that $50 cash was again "vouchered" to the NYPD property department. (*Id.,* Ex. J.)

The tape does not indicate that Brian Cabrera was involved in this transaction.

Sgt. Raia filed another Investigative Report documenting the CI's transaction, and that report suggests that the CI transacted with 5 Borough employee Ryan Ali. (Getzer Decl., Ex J.) According to the CI, an individual matching the description of Ruben Cabrera was also present. Notably, Marti does not contend that either undercover transaction involved anyone matching the description of Brian Cabrera.

Plaintiffs offer sworn evidence from Ryan Ali that no transaction was consummated, and argue that comments captured on the recording suggesting that the jewelry was stolen were made in connection with a side-conversation the CI was having on his cell phone, and were not heard by the 5 Borough employee. (*See,* Aff. of Ryan Ali, ¶ 4.)

Based on the evidence uncovered through the "reverse sting" operation, NYPD officer Keith Doumas obtained a search warrant for 5 Borough on May 14, 2008. The warrant was signed by a Queens County Criminal Court judge. The warrant authorized officers to search 5 Borough for the jewelry that was allegedly sold to the store in the "reverse sting" sales, and to seize said jewelry, as well as the pawnshop's computers. (*Id.,* Ex. K.)

The warrant was executed on May 15, 2008, by Sgt. Marti and several other officers. According to Raia, the CI made a "confirmatory sale" approximately 15 minutes before officers entered the premises to conduct the search. (Danielle Raia Dep., 40:13–42:6.) The purpose of the "confirmatory sale" appears to have been to ensure that something purchased in connection with the "reverse sting" operation was found during the search, in case the items sold on April 16 and May 6 had already been re-sold or otherwise disposed of by 5 Borough. (*Id.*)

Pursuant to the warrant, officers retrieved several items from the pawnshop's safe, as well as 5 Borough's computers. The only item recovered that was linked to the "reverse sting" operation was the piece of jewelry purchased at the "confirmatory sale." (Gertzer Decl., Ex. M.)

### (2) Discussion

■ Brian Cabrera alleges that his arrest was unlawful because it occurred prior to the execution of the search warrant, and in the absence of an arrest warrant or probable cause. Sgt. Marti claims that he had, at a minimum, arguable probable cause to arrest Cabrera, and that he is therefore shielded from suit by qualified immunity.

In *5 Borough I*, the Court held that Marti was not entitled to qualified immunity on this issue at the pre-discovery stage. The Court explained:

> Marti cannot rely on the search warrant to establish probable cause. A search warrant is different from an arrest warrant. A search warrant allows the police to search a location for the objects described in the warrant. It does not, on its own, authorize the police to make an arrest. If an officer makes an arrest while executing a *search* warrant, the officer is making a warrantless arrest.... An officer may make a warrantless arrest for a crime committed outside his presence when he has probable cause to believe that a crime was committed by that person. N.Y.Crim. Proc. Law § 140.10. Whether Marti is entitled to qualified immunity for the Second Arrest hinges on whether, at the time of the arrest, Marti had "arguable probable cause" to believe that Cabrera ... committed a crime outside his presence, i.e., receiving and concealing stolen property.

640 F.Supp.2d at 294. The court went on to state that whether Marti had arguable probable cause to believe that Brian Cabrera had committed a crime outside his presence could be proved in one of two ways: (1) the "reverse sting" operation produced evidence that Cabrera purchased stolen goods; or (2) Cabrera was arrested *after* the search was conducted, not before. *Id.* at 296.

Marti does not deny that Cabrera was arrested *before* the pawnshop was searched, so the police had yet to find the "confirmatory" merchandise in the safe at the time they arrested him. Therefore, Marti had arguable probable cause to arrest only if the reverse sting produced evidence—evidence communicated to Marti—that Cabrera had purchased the stolen goods.

Under the fellow officer rule, Sgt. Raia's report (the one on which the search warrant issued) gave Marti probable cause to arrest *Ali* for the activity that occurred prior to May 15. But Raia's report to her fellow officer does not implicate Cabrera in either of the pre-May 15 transactions. There is not a scintilla of evidence that Cabrera was personally involved in either of the "sting operation" transactions with Sgt. Raia and the CI. Marti has not cited any authority for the proposition that Cabrera could be arrested if Raia told Marti that Raia had probable cause to believe that one of 5 Borough's employees (Ali) committed a crime.

So we come to May 15, the day of the second arrest. On that day Cabrera did not commit a crime in Marti's presence, and as explained in *5 Borough I*, the search warrant did not authorize Cabrera's arrest (although Marti plainly thought that it did). Cabrera may have been subject to arrest after the search turned up the "confirmatory" merchandise, but he was arrested before the search was conducted.

There is one other possibility: if either the CI or a fellow officer working with the CI told Marti that Cabrera had purchased merchandise after being told it was stolen, then Marti would have had probable cause to arrest Cabrera prior to the search of the safe. However, the record is absolutely barren of any evidence that anyone told Marti anything about what transpired in the shop during the "confirmatory sale." There is no recording of the "confirmatory sale," either audio or video. There is no evidence from the CI about what he said while in the store. Cabrera admits to conducting a transaction with the CI on May 15, but flatly denies that the "confirmatory sale" merchandise was represented as being stolen. There is no evidence about what the CI said to the officers, if anything, when he emerged from 5 Borough after completing the "confirmatory sale." And there is no evidence about what any officer told any other officer after speaking to the CI post "confirmatory sale." The evidence about this transaction is limited to (1) a receipt provided by 5 Borough to the CI (but of course nothing on the receipt suggests what was said to whoever was standing behind the counter at 5 Borough, (*see* Gertzer Decl., Ex. L.)), and (2) the fact that the piece of jewelry allegedly used was found in the store's safe when it was searched pursuant to the warrant.

The problem here is probably not the procedures that were used by the police on May 15, 2008. Were the facts fully developed and presented in proper evidentiary form, they may show that Marti had probable cause, or at least arguable probable cause, to arrest Cabrera for receiving stolen property as soon as officers entered the premises to conduct the search on May 15 which is before the search of the pawnshop commenced. (*See* Ron Marti Dep. at 154:23–155:5.). The problem here is a lack of admissible evidence—in the form of sworn testimony, affidavits, and properly-attested documents—showing that Marti was provided with probable cause (or arguable probable cause) to make the arrest. Marti fails to provide the court with an adequate and admissible account of what transpired between the CI and Cabrera, and—more important—what information about that encounter was transmitted to him, and how, and when (before or after the arrest).

Neither is there anything in the record about "confirmatory sales" that would allow the court to infer that Marti's knowledge about that maneuver gave him probable cause to arrest Cabrera. If, for example, Marti was told, by the CI or a fellow officer, that a confirmatory transaction "went down," he might have known, from his training and experience, that the person behind the counter was told that the merchandise he was selling was stolen—because that was the standard procedure when executing confirmatory sales. But no evidence in the record with which I have been provided fleshes any of this out.

The reason why this is so important is that Marti's testimony about why he arrested Cabrera on May 15 is not helpful to his cause. He insists that the basis for the arrest was the search warrant. That is not what they teach at the Police Academy.

Because of an absence of proof, Marti has not established that he is entitled to qualified immunity to shield him from liability for the Second Arrest. I have little doubt that he will be able to offer the necessary proof at trial, but it will have to abide trial, because Marti has already made two dispositive motions and the court will not be burdened with a third.

Marti's motion for summary judgment dismissing the false arrest and false im-

prisonment claims contained in plaintiffs' second and tenth causes of action pursuant to the doctrine of qualified immunity is denied.

## II. Cabrera's Malicious Prosecution Claims

### A. Applicable Legal Standards

To state a claim for malicious prosecution under § 1983, a plaintiff must prove the same four elements required to state a claim for malicious prosecution under New York state law: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; (4) and actual malice as a motivation for defendant's actions. *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir.2003). A claim for malicious prosecution under § 1983, however, also requires a post-arraignment deprivation of liberty that rises to the level of a constitutional violation.

### B. *Sgt. Marti is Entitled to Summary Judgment in Part on Cabrera's Malicious Prosecution Claims*

Plaintiffs' eleventh cause of action asserts claims for malicious prosecution arising from both the First and Second arrests. That cause of action must be dismissed as to claims arising from the Second Arrest, because no criminal proceedings were ever initiated.

While Cabrera was arrested on May 15 2008, the arrest was dismissed the following day, prior to arraignment. (Decl. of Michael K. Gertzer, Ex. N.) Malicious prosecution does not occur "unless, among other things, the defendant commences or continues a criminal proceeding against the plaintiff." *Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir.2004) (*citing Broughton v. State of New York*, 37 N.Y.2d

451, 457, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)). Therefore, Cabrera has failed to make a prima facie showing of malicious prosecution arising from the Second Arrest.

His malicious prosecution claim arising out of the First Arrest, however, is another matter. Cabrera was arrested on January 23, 2008, and the charges were not dropped until September 4, 2008. *5 Borough I*, 640 F.Supp.2d at 282. Therefore, Cabrera's malicious prosecution claims arising from the First Arrest survive Marti's motion for summary judgment, because (as discussed above), a genuine issue of material fact exists about whether Sgt. Marti had probable cause to commence criminal proceedings against Cabrera following the First Arrest.

Marti's argument that Cabrera's malicious prosecution claims should be dismissed because they were not articulated in Plaintiff's Notice of Claim is without merit. Plaintiffs' Notice of Claim alleges "a violation of due process—arising out of threats, harassment, intimidation, unjust arrest, illegal confinement, false imprisonment, and interference with personalty and property." (Decl. of Michael K. Gertzer, Ex. P.) This language is sufficient to put Sgt. Marti on notice of a claim for malicious prosecution. Therefore, Marti's motion for summary judgment on Plaintiffs' eleventh cause of action for malicious prosecution is granted in part and denied in part.

## III. Cabrera's State Law Assault Claim

Marti's motion for summary judgment dismissing the state law assault claim asserted in the tenth cause of action is denied.

Cabrera's complaint is read to allege state law claims for both assault and battery. To establish an assault claim under New York law, plaintiff must show

that defendant placed the plaintiff in reasonable fear of imminent harmful or offensive bodily contact. To establish a claim for battery, the plaintiff must show that defendant intentional caused a wrongful physical contact with the plaintiff without his consent. *United Nat. Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir.1993). "If an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." *Sulkowska v. City of New York*, 129 F.Supp.2d 274, 294 (S.D.N.Y.2001) (*citing Johnson v. Suffolk Co. Police Dept.*, 245 A.D.2d 340, 665 N.Y.S.2d 440 (1997))

■ In *Johnson*, plaintiff brought false arrest and assault and battery claims against a police officer. The trial court awarded plaintiff judgment as a matter of law for damages resulting from her claim for false arrest, but a jury found in favor of defendant on plaintiff's assault and battery claims. The trial court subsequently granted plaintiff's motion for judgment as a matter of law on the assault and battery claims. In affirming the trial court's decision, the Appellate Division held that defendant committed battery as a matter of law by touching plaintiff during the unlawful arrest. 665 N.Y.S.2d at 440–441. Therefore, because genuine issues of material fact exist as to whether Sgt. Marti had probable cause to arrest Cabrera on January 23 and May 15, a material issue of fact exists as to whether Sgt. Marti assaulted Cabrera on those dates by arresting him.

### IV. Intentional Infliction of Emotional Distress ("IIED")

#### A. *Sgt. Marti's Motion for Summary Judgment is Granted as to Plaintiffs' IIED Claims*

All three Plaintiffs bring IIED claims against Sgt. Marti. Brian Cabrera's claim arises from the fact that he was arrested twice without probable cause. Ruben and Rebecca Cabrera's claims are predicated on the fact that they witnessed their son's arrest.

■ IIED is a highly disfavored cause of action that is almost never successful. In order to prevail, a plaintiff must demonstrate conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999) (*quoting Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). The standard is almost impossible to meet, and viewing the evidence most favorably to the Plaintiffs, there is nothing here that rises to the necessary level. Therefore the IIED claims asserted in Plaintiffs' fifth cause of action are dismissed.

### V. Plaintiffs' Motion for a Protective Order is Denied

Plaintiffs have moved to compel the Court to issue a protective order pursuant to Federal Rule of Civil Procedure 26 "denying Defendants' right to produce it's [sic] alleged audio sting tape."

Sgt. Marti has an audio tape of the transaction between the CI and Ali, which took place on May 6, 2008. Plaintiffs' counsel has heard the tape pursuant to an order of Magistrate Judge Francis, and Plaintiffs have also received a redacted transcript of the tape. However, Plaintiffs themselves have not heard the tape, by order of the Magistrate Judge; defendants do not want the Plaintiffs to hear the tape, because, they contend, the CI's voice is recognizable and the defendants do not wish to reveal his identity.

202

The motion for a "protective order" is nothing more than an effort to get around the Magistrate Judge's ruling via a belated appeal. It is denied.

Of course, at the trial the CI will have to be identified and if the tape is played the Plaintiffs will hear it. I will not preclude the playing of the tape at the trial, so if this motion is construed as a premature motion in limine it is denied.

### VI. Cabrera's Cross–Motion for Summary Judgment is Denied

As discussed above, genuine issues of material fact exist concerning whether Cabrera was arrested without probable cause on January 23, 2008, and May 15, 2008. Marti is not entitled to summary judgment, but neither is Cabrera.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (docket no. 51) is granted in part and denied in part. Plaintiff's cross motion (docket no. 58) is denied. The Clerk of the Court is instructed to remove docket numbers 51 and 58 from the Court's active motion list.

This constitutes the decision and order of the Court.